JEFFREY D. FARROW (SBN 180019)
*Email: jfarrow@mrllp.com*
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Avenue, Suite 1000
Irvine, CA 92614
Telephone: (714) 577-7990
Facsimile: (714) 557-7991

JOHN A. SEBASTINELLI (SBN 127859)
*Email: jsebastinelli@mrllp.com*
**MICHELMAN & ROBINSON, LLP**
One Post Street, Suite 2500
San Francisco, California 94104
Telephone: (415) 882-7770
Facsimile: (415) 882-1570

Attorneys for Plaintiff
LLOYD T. WHITAKER, in his capacity as the Liquidating Trustee of the Embarcadero Liquidating Trust

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**

| | |
|---|---|
| LLOYD T. WHITAKER, in his capacity as the Liquidating Trustee of the Embarcadero Liquidating Trust,<br><br>Plaintiff,<br><br>vs.<br><br>DANIEL G. HICKEY, JR., DANIEL G. HICKEY, SR., JAMES J. SCARDINO, CHESTER J. WALCZYK, JOSEPH F. TAYLOR, KEITH HYNES and DAVID M. BIRSNER,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

/ / /

/ / /

/ / /

Plaintiff Lloyd T. Whitaker, in his capacity as the Liquidating Trustee of the Embarcadero Liquidating Trust (the "**Liquidating Trustee**"), hereby alleges as follows:

## I. PARTIES, JURISDICTION AND VENUE.

### A. Majestic Capital and Its Subsidiaries.

1. Majestic USA Capital, Inc., formerly known as CRM USA Holdings, Inc. ("**Majestic USA**"), is a Delaware corporation that at all times relevant hereto was wholly owned by Majestic Capital, Ltd., formerly known as CRM Holdings, Ltd. ("**Majestic Capital**"), a Bermuda corporation. Majestic USA was incorporated in 2005 to serve as a holding company for Majestic Capital's U.S.-based operations.

2. Embarcadero Insurance Holdings, Inc. ("**Embarcadero**") is a California corporation that served as a holding company for Majestic Insurance Company ("**Majestic Insurance**"), a California-based underwriter of workers' compensation insurance that was licensed in approximately fifteen states and that was formed in March 1980 under the name of The Great Western Insurance Co. In November 2006, Majestic USA acquired all of the stock of Embarcadero. At all times relevant hereto, Majestic Insurance's business was operated out of offices located in San Francisco, California and, upon Majestic USA's acquisition of Embarcadero, in Poughkeepsie, New York.

3. On April 19, 2011, the Insurance Commissioner of the State of California (the "**Commissioner**") placed Majestic Insurance into a conservation proceeding by initiating the matter entitled *Insurance Commissioner of the State of California v. Majestic Insurance Company*, Case No. CPF-11-511261 (the "**Conservation Proceeding**"), with the Superior Court for the State of California, City and County of San Francisco (the "**Conservation Court**"), thereby creating a conservation estate (the "**Conservation Estate**").

4. On April 21, 2011, the Conservation Court appointed the Commissioner as the conservator of Majestic Insurance (the "**Conservator**"). All of the shares of Majestic Insurance, as the same are represented by a *Trust Certificate* issued by the Conservator pursuant to that certain *Conservation Trust Agreement* dated January 22, 2013 and approved by the Conservation Court on February 25, 2013, are presently owned by the Embarcadero Liquidating Trust.

**B. <u>The Bankruptcy of Majestic Capital and Its Non-Insurance Subsidiaries, and the Appointment of the Liquidating Trustee</u>.**

5. On April 29, 2011 (the "**<u>Petition Date</u>**"), Majestic Capital and its five direct and indirect non-insurance subsidiaries, including Majestic USA and Embarcadero (collectively, the "**<u>Debtors</u>**"), filed *Voluntary Petitions* for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., with the United States Bankruptcy Court for the Southern District of New York (the "**<u>Bankruptcy Court</u>**"), thereby initiating cases jointly administered under Case No. 11-36225 (CGM). The cases were not, and have not been, substantively consolidated.

6. Pursuant to the *First Amended Joint Plan of Liquidation of Majestic Capital, Ltd., Majestic USA Capital, Inc., Compensation Risk Managers, LLC, Compensation Risk Managers of California, LLC, Eimar, LLC and Embarcadero Insurance Holdings, Inc*. (the "**<u>Plan</u>**"), which the Bankruptcy Court confirmed by order dated April 27, 2012 (the "**<u>Confirmation Order</u>**"), and which became effective as of May 18, 2012 (the "**<u>Effective Date</u>**"), a liquidating trust was created for each of the Debtors (collectively, the "**<u>Liquidating Trusts</u>**"), and all of the assets, including causes of action, belonging to the Debtors' respective estates were transferred to, and became assets of, the respective Liquidating Trusts as of the Effective Date.

7. Pursuant to the Plan, the Confirmation Order and the *Liquidating Trust Agreements* entered into by and between the Liquidating Trustee and each of the Debtors in accordance with the Plan, the Liquidating Trustee, who resides in Atlanta, Georgia, was appointed as the Liquidating Trustee for the Liquidating Trusts as of the Effective Date. The Liquidating Trustee is vested with the authority to investigate causes of action belonging to the Debtors' respective estates and to pursue such causes of action for the benefit of the respective Liquidating Trusts. The Liquidating Trustee is, therefore, a duly authorized estate representative with the exclusive right and standing to prosecute the causes of action asserted herein.

8. The Embarcadero Liquidating Trust is the assignee, pursuant to an *Unconditional Assignment* executed and delivered to the Liquidating Trustee by the Conservator, of any and all rights, claims and causes of action that Majestic Insurance or the Conservation Estate has or may

have against any former directors, officers, employees, agents, consultants, affiliates or subsidiaries of Majestic Insurance or any one or more of the Debtors, including but not limited to the individuals named as Defendants herein, arising from, relating to or in connection with his, her or its relationship with Majestic Insurance, including but not limited to those for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and gross negligence.

**C. The Defendants.**

9. At various times relevant hereto, defendant Daniel G. Hickey, Jr. ("**Hickey Jr.**") served as Chairman of the Board of Directors (the "**Board**") and Chief Executive Officer of Majestic Insurance. Upon information and belief, Hickey Jr. resides in Poughkeepsie, New York.

10. At various times relevant hereto, defendant Daniel G. Hickey, Sr. ("**Hickey Sr.**") served as a Director of Majestic Insurance. Upon information and belief, Hickey Sr. resides in Poughkeepsie, New York.

11. At various times relevant hereto, defendant James J. Scardino ("**Scardino**") served as a Director, Chief Executive Officer, Chief Financial Officer and Executive Vice President of Majestic Insurance. Upon information and belief, Scardino resides in Wellesley, Massachusetts.

12. At various times relevant hereto, defendant Chester J. Walczyk ("**Walczyk**") served as a Director, Chief Operating Officer and Executive Vice President of Majestic Insurance. Upon information and belief, Walczyk resides in Hamburg, New York.

13. At various times relevant hereto, defendant Joseph F. Taylor ("**Taylor**") served as a Director and Chief Financial Officer of Majestic Insurance. Upon information and belief, Taylor resides in Poughkeepsie, New York.

14. At various times relevant hereto, defendant Keith S. Hynes ("**Hynes**") served as a Director of Majestic Insurance. Upon information and belief, Hynes resides in Bonita Springs, Florida.

15. At various times relevant hereto, defendant David Birsner ("**Birsner**") served as a Director of Majestic Insurance. Upon information and belief, Birsner resides in Poughkeepsie,

New York.

16. Hickey Jr., Hickey Sr., Scardino, Walczyk, Taylor, Hynes and Birsner are sometimes collectively referred to herein as the "**Defendants**." To the extent that references to the Defendants are made in respect of matters that occurred after March 2009, such references do not include Hickey Jr.

**D. Jurisdiction.**

17. Jurisdiction in this district exists pursuant to 28 U.S.C. § 1332.

**E. Intradistrict Assignment.**

18. Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the causes of action asserted herein occurred in the Northern District of California. By way of example, and not by way of limitation, the Defendants regularly attended Board meetings in San Francisco, California, oversaw and managed the conduct of Majestic Insurance's business at its office located in San Francisco, California, and investigated (but ultimately ignored) matters concerning the operation of Majestic Insurance's business brought to their attention by individuals located in the Northern District of California, including Majestic Insurance's former Chief Financial Officer. In addition, upon information and belief, many of the individuals with knowledge or information concerning the matters alleged herein reside in or are employed in the Northern District of California, and the books and records maintained by Majestic Insurance and the Conservator are located in the Northern District of California.

## II. STATUTES OF LIMITATIONS AND TOLLING THEREOF.

19. During all times relevant hereto, the Defendants controlled Majestic Insurance and the Board. Due to long-standing personal and business relationships that Hickey Sr. and Hickey Jr. had with the some or all of the other Defendants, and due to the domination and control they exercised over the other Defendants, the Defendants individually and collectively lacked independence and were incapable of protecting, and did not protect, the interests of Majestic Insurance. Moreover, as a result of this domination and control and the personal and business relationships that existed between and amongst the Defendants, Majestic Insurance was

incapable of attracting or retaining Board members who were truly independent and who would act in Majestic Insurance's best interests and, in fact, did not attract or retain any such Board members.

20. Hickey Jr. possessed a dominating and controlling personality, was unqualified to serve as the Chief Executive Officer of what had previously been a very successful insurance company (or of the other companies in the Majestic Capital corporate family) and was intolerant of dissent. Throughout his tenure, Hickey Jr. chastised other Board members and employees who threatened or questioned his leadership, his judgment or his decisions. Hickey Jr. also repeatedly engaged in conduct that demonstrated he was wholly unfit to serve as the leader of Majestic Insurance, yet that conduct went unchecked by the other Defendants.

21. As the father of Hickey Jr., Hickey Sr. had a conflict of interests that prevented him from acting independently and in the best interests of Majestic Insurance at all times, and from questioning Hickey Jr.'s leadership, judgment or decisions.

22. To ensure that Hickey Jr. and Hickey Sr. would maintain *de facto* control of Majestic Insurance, and that Hickey Jr.'s leadership, judgment and decisions as Chief Executive Officer would not be questioned, Hickey Jr. and Hickey Sr. assembled a Board and a management team for Majestic Insurance comprised primarily of friends and business acquaintances—most of whom had no prior experience in the workers' compensation insurance industry, and none of whom would seriously challenge Hickey Jr. or question his decisions.

23. Upon information and belief, Birsner was a friend and business partner of Hickey Jr. and Hickey Sr. As such, Birsner had a conflict of interests that prevented him from acting independently and properly discharging his duties as a Director of Majestic Insurance, and from questioning Hickey Jr.'s leadership, judgment or decisions.

24. Upon information and belief, Taylor was a friend of Hickey Jr. and Hickey Sr. As such, Taylor had a conflict of interests that prevented him from acting independently and properly discharging his duties as a Director and Chief Financial Officer of Majestic Insurance, and from questioning Hickey Jr.'s leadership, judgment or decisions.

25. Upon information and belief, Scardino was an acquaintance of Hickey Jr. and had

personal and business relationships with Hynes, was also an acquaintance of Hickey Jr. and Hickey Sr. As such, Scardino had a conflict of interests that prevented him from acting independently and properly discharging his duties as a Director, Chief Executive Officer, Chief Financial Officer and Executive Vice President of Majestic Insurance, and from questioning Hickey Jr.'s leadership, judgment or decisions.

26. Upon information and belief, Hynes was a friend of Scardino and an acquaintance of Hickey Jr. As such, Hynes had a conflict of interests that prevented him from acting independently and properly discharging his duties as a Director of Majestic Insurance, and from questioning Hickey Jr.'s leadership, judgment or decisions.

27. Each of the Defendants were fiduciaries with the responsibility of asserting and enforcing claims belonging to Majestic Insurance. As a result of their personal and business relationships, their lack of independence, and the domination and control that Hickey Jr. and Hickey Sr. exercised, the remaining Defendants, individually and collectively, failed to assert and enforce the claims alleged herein on behalf of Majestic Insurance, as such claims would expose the Defendants' own wrongful conduct and breaches of fiduciary duties. Because the Defendants dominated and controlled Majestic Insurance and acquiesced and submitted to such domination and control, there was no possibility that any truly independent director could have or would have caused Majestic Insurance to bring suit against the Defendants.

28. The Defendants, as fiduciaries of Majestic Insurance, maintained total custody and control over Majestic Insurance's business affairs and property, and otherwise concealed their own wrongful conduct from the California Department of Insurance (the "**CDI**") through the date on which the Commissioner initiated the Conservation Proceeding and also through the Petition Date. The statutes of limitations for the causes of action asserted herein were thus tolled until such time that the Liquidating Trustee was appointed and had an opportunity to conduct an independent investigation, on behalf of the Embarcadero Liquidating Trust and the Conservation Estate, of such causes of action.

29. In addition, the Liquidating Trustee and the Defendants entered into an agreement dated as of April 8, 2013 (the "**Tolling Agreement**"), pursuant to which they agreed to toll and

suspend the running of any and all applicable statutes of limitations, repose or other defenses, or limitations on actions that may apply to any of the causes of action asserted herein. Pursuant to a series of amendments to the Tolling Agreement entered into by and amongst the Liquidating Trustee and the Defendants, the Tolling Agreement remains in full force and effect.

## III. FACTS COMMON TO ALL COUNTS.

30. Day-to-day management of Majestic Insurance fell under the control of Hickey Jr., Scardino, Walczyk and Taylor, each of whom was an officer of Majestic Insurance. The responsibility to oversee the business of Majestic Insurance belonged to Hickey Jr., Hickey Sr., Scardino, Walczyk, Hynes, Taylor and Birsner, each of whom was at various times a member of the Board. That responsibility included the obligation to manage and oversee the business affairs of Majestic Insurance to ensure, amongst other things, that Hickey Jr., Scardino, Walczyk and Taylor, as well as Majestic Insurance's management and employees, were properly fulfilling their duties. Accordingly, each of the Defendants owed Majestic Insurance the fiduciary duties of loyalty, care and good faith.

### A. The Acquisition of Majestic Insurance.

31. On November 14, 2006, Majestic USA acquired all of the stock of Embarcadero for an aggregate purchase price of $48.2 million. Majestic USA issued approximately $36.1 million in debentures, which debt Majestic Capital guaranteed, to fund most of the purchase price. At or around the time of the acquisition, Majestic USA also made a $5 million capital contribution to Majestic Insurance, bringing the total initial investment in Embarcadero and Majestic Insurance to $53.2 million. Upon information and belief, the acquisition was motivated by, amongst other things, a slowdown in the fee-based management services business of Majestic Capital's other subsidiaries, which was caused by low premium rates, excess underwriting capacity, increased market competition and pricing pressures, and by the Defendants' desire to maintain growth potential in the face of a declining and riskier market.

32. When the CDI approved the sale of Majestic Insurance in 2006, it did so based on several key conditions. First, Majestic Insurance's business practices, including its disciplined underwriting approach, were to "remain unchanged." Second, Majestic Insurance's long-time

President and Chief Executive Officer, John Sullivan ("**Sullivan**"), was to "continue to manage the day-to-day operations of Majestic," and other senior-level officers, including Jay Stewart ("**Stewart**"), Majestic Insurance's Chief Financial Officer, were to remain with the company with "no material changes in their responsibilities." In furtherance of these conditions, Sullivan and Stewart executed employment agreements at the time of the acquisition. Finally, it was represented to the CDI that Majestic Insurance "will continue to maintain its separate corporate existence," independent from the other companies in the Majestic Capital corporate family, and that it would remain in its "current headquarters" in San Francisco, California.

33. Shortly after the acquisition, many of Majestic Insurance's senior-level management positions and seats on the Board were filled by the Defendants. Specifically, Hickey Jr. became Majestic Insurance's Chief Executive Officer, Scardino became an Executive Vice President, and Walczyk became its Chief Operating Officer and Executive Vice President. Hickey Sr., Hynes and Birsner joined Hickey Jr. as members of the Board. Subsequently, Scardino became a Director, Chief Financial Officer and Chief Executive Officer, Walczyk became a Director and Taylor became a Director and Chief Financial Officer.

34. Majestic Insurance had been profitable for many years, and shortly after the acquisition, Majestic Insurance was issued a solid "A-" rating from A.M. Best Company ("**A.M. Best**"). The "A-" rating put Majestic Insurance in a position to underwrite good quality business and to generate strong underwriting profits.

35. In order for Majestic Insurance to continue to function profitably, it was incumbent upon the Defendants to maintain and enforce the key risk management controls that Majestic Insurance's management had implemented before the acquisition. Those controls, which had made Majestic Insurance a successful and profitable company for many years, included sound underwriting practices and reserving methodologies.

36. As A.M. Best reported in 2006, "operational profitability (underwriting and investment income) is the single most important source of surplus growth" for an insurance company and "risk management is paramount to an insurer's long-term success." According to A.M. Best, a profitable, well-run insurance company must have a "strong risk management

culture" that focuses on the risks that are critical to an insurance's company's long-term success, including underwriting risk, such as proper appreciation of risks and analysis of loss, operational risk, including exposure arising from damage to a company's reputation as a result of an internal or external factor, and strategic risk, relating, for instance, to poor decision-making.

37. The Defendants understood these risks and/or had a fiduciary duty to gain an understanding of these risks, and therefore knew or should have known that for Majestic Insurance to function profitably, it was absolutely critical that the Defendants maintain and enforce the system of internal controls that had made Majestic Insurance a successful and profitable insurance company. Nevertheless, the Defendants took steps to override existing and effective controls while forcing long-standing and experienced senior executives, including Sullivan and Stewart, out of Majestic Insurance in a matter of months after the acquisition. These actions put Majestic Insurance on the path toward financial ruin.

**B. The Defendants Know That the "Tone at the Top" Is Poor, Yet Disregard Facts That Make It Clear Hickey Jr. Is Not Capable of Leading an Insurance Company.**

38. The Defendants knew or should have known that one of the single most important factors in ensuring that a board of directors and a management team act in a manner that is consistent with all of their fiduciary duties is having the right "tone at the top." A company's leader creates the culture for the entity as a whole.

39. While having the proper "tone at the top" is critical in any corporate setting, according to A.M. Best it is absolutely imperative that the senior management of an insurance company establish an environment that embeds risk awareness throughout the organization and cultivates a "strong risk management" culture. An insurance company's entire existence and ability to earn profits hinges on careful risk management.

40. The Defendants knew or should have known that Hickey Jr. had no experience leading an insurance company, where the failure to implement and maintain proper risk management practices, such as proper underwriting and claims management, would be catastrophic.

41. The Defendants knew or should have known that Hickey Jr.'s abrasive and

aggressive management style, along with his myopic focus on meeting short-term earnings targets without regard to long-term viability, was not suitable for the leadership of an insurance company, which requires, amongst other things, carefully planned risk management, input from trained underwriters and careful evaluations of loss.

42. The Defendants should have taken steps to ensure that Majestic Insurance was protected from harm, in order to preserve it and the value that could be ascribed to it as a result of Majestic USA's investment in it. The Defendants had a duty to demote or discharge Hickey Jr. and to replace him with someone who was experienced in leading an insurance company and who would safeguard Majestic Insurance's business and reputation.

43. The Defendants knew or should have known that the CDI had approved the acquisition of Majestic Insurance based upon representations that its then-existing officers, including Sullivan and Stewart, would remain in control of day-to-day operations. It was therefore incumbent upon the Defendants to ensure that Majestic Insurance's operations would continue under an experienced leader such as Sullivan, who had successfully run Majestic Insurance for nearly twenty years and who was supposed to remain in control of its operations in accordance with the CDI's requirements.

44. Within months of the acquisition of Majestic Insurance, however, Hickey Jr. and the other Defendants effectively seized control of Majestic Insurance's day-to-day operations. They sought to grow Majestic Insurance's premium revenue without any regard for the cost of that growth or, equally importantly, the level of risk that Majestic Insurance was taking on to achieve it. Existing underwriting standards were overridden, exposing Majestic Insurance to significant financial losses. Majestic Insurance's experienced high-level executives, including Stewart, its Chief Financial Officer, were effectively forced out even as they attempted to protect Majestic Insurance. As a result of the Defendants' knowing and reckless disregard for their fiduciary duties, the business of Majestic Insurance was ultimately destroyed.

**C. <u>Sullivan, Majestic Insurance's Long-Time Leader, Resigns Just Two Months After the Acquisition</u>.**

45. As is noted above, the CDI approved the acquisition of Majestic Insurance on the

condition that Majestic Insurance's President and Chief Executive Officer, Sullivan, who was an experienced insurance company executive, would remain in control of Majestic Insurance's day-to-day operations. Sullivan had built Majestic Insurance into a profitable insurance company using a conservative and disciplined approach to underwriting. It was therefore critical to keep Sullivan in place at Majestic Insurance after the acquisition. Retaining Sullivan to oversee the day-to-day operations should have been a priority in view of the lack of experience that Hickey Jr. had leading an insurance company, and because the Defendants as a group lacked the necessary experience.

46. As is noted above, prior to the acquisition, the Defendants represented to the CDI that Majestic Insurance would remain in its existing headquarters. Nevertheless, on February 1, 2007, just a few months after the acquisition, Hickey Sr. and Scardino proposed to the Board that the company execute a new, more expensive lease for space "north of Market Street" in downtown San Francisco, California. Attendees at the meeting included Hickey Jr., Hickey Sr., Birsner, Hynes, Scardino and Walczyk. As reflected in the meeting minutes, rents in that area of San Francisco were "considerably higher than south of Market Street where Majestic [Insurance] was currently located," yet Scardino and Hickey Sr. talked about the "positives" of moving the offices.

47. The proposed move to one of the most expensive areas of San Francisco was inconsistent with the CDI's conditions in approving the acquisition, as well as with Majestic Insurance's business model and image as a conservatively run insurer. At the meeting, Sullivan objected to the move, noting that Majestic Insurance's current space was "adequate" and that "there was better use for the money being spent."

48. As the Chairman of the Board and the individual in charge of Majestic Insurance's day-to-day operations, Sullivan was the person most knowledgeable about Majestic Insurance's ability to afford a significantly greater monthly lease payment. Despite Sullivan's objection, however, the newly constituted Board voted 3-1 to approve the proposed lease, with the sole dissenting vote being Sullivan's. Voting in favor, but without having made any inquiry regarding the effect that the move would have on Majestic Insurance or the concerns that

Sullivan raised, were Hickey Sr., Hynes and Birsner. Notably, Hickey Jr. left the meeting before the votes were cast.

49. On February 4, 2007, just three days after the meeting, Sullivan sent a resignation letter to Hickey Jr., which stated, in pertinent part, that "per our discussions over the last two weeks, I am confirming and submitting my notice of retirement from employment with Majestic Insurance Company." Sullivan's resignation became effective on February 19, 2007.

50. Upon information and belief, Sullivan resigned because he believed that Hickey Jr. and the other Defendants were making decisions and implementing changes that were not in the best interests of Majestic Insurance.

51. Upon Sullivan's resignation, the Defendants owed a duty to ensure that Majestic Insurance's operations were run by someone competent to lead an insurance company. Having an individual experienced in Majestic Insurance's operations serve on its Board also should have been a priority.

52. Instead, the Defendants knowingly and recklessly permitted Hickey Jr., who was already Chief Executive Officer, to become the Chairman of the Board and to gain further control of Majestic Insurance's day-to-day operations. Further, the Defendants knowingly and recklessly permitted Walczyk, who had worked with Hickey Jr. since at least 2004, to fill Sullivan's seat on the Board.

53. With Sullivan no longer in control of day-to-day operations, the Defendants began overriding Majestic Insurance's existing internal controls and taking other steps that were detrimental to Majestic Insurance, thereby opening it up to significant risks and the possibility of massive losses.

**D. <u>The Defendants Expose Majestic Insurance to Unreasonable and Unjustifiable Harm</u>.**

54. In early 2007, New York Marine and General Insurance Company ("**<u>NYMAGIC</u>**"), which provided excess and frequency reinsurance coverage to group self-insured workers' compensation insurance trusts (each, a "**<u>GSIT</u>**") in New York and California, was looking to exit the GSIT reinsurance business and to eliminate what it perceived to be

increasing risk associated with the New York and California GSITs by transferring all GSIT-related reinsurance obligations and liabilities off of its books.

55. To that end, NYMAGIC approached Hickey Jr. about the possibility of a novation, pursuant to which Majestic Insurance would assume NYMAGIC's liabilities to the New York and California GSITs. Notably, prior to the acquisition, Majestic Insurance, led by its California-based management team and underwriters, had not conducted any meaningful business in New York or the surrounding area, and had operated only in California, Alaska, Arizona, Nevada, Oregon and Washington.

56. In the spring of 2007, with Sullivan having been forced out, the Defendants caused Majestic Insurance to enter into a *Novation Agreement* (the "**Novation**") with NYMAGIC, pursuant to which Majestic Insurance assumed all of NYMAGIC's increasing reinsurance exposure relating to the GSITs. Specifically, at a special meeting held on May 2, 2007, at which Hickey Jr., Hickey Sr., Hynes, Walczyk and Scardino were present, the Board adopted a resolution authorizing Majestic Insurance to enter into the Novation.

57. The Defendants were familiar with the GSITs, their financial condition and the actuarial work that had been performed on their behalf. Given that familiarity, it was incumbent upon the Defendants to evaluate the Novation carefully, to inquire about the terms of the Novation and the effect it would have upon Majestic Insurance's business, to determine that a legitimate business purpose existed for Majestic Insurance to assume NYMAGIC's increasing reinsurance exposure, and to understand the assumptions that were being used to price the transaction. The meeting minutes, however, reflect that the Defendants asked no questions about the transaction whatsoever, and demonstrate that they knowingly and recklessly approved the Novation notwithstanding the existence of facts that made it clear the transaction was not in Majestic Insurance's best interests.

58. Significantly, Majestic Insurance's long-time Chief Financial Officer, Stewart, was not invited to join the meeting even though, as Majestic Insurance's top financial officer, he could have provided valuable insight into the Novation and its potential risks. As he later documented at the time of his resignation from Majestic Insurance, Stewart's absence at the

meeting was not coincidental.

59. The Novation was finalized on June 28, 2007, just two days before the end of the fiscal quarter. The Novation assumed a 40% loss ratio and NYMAGIC transferred $9.2 million of premiums to Majestic Insurance based upon that figure. In effect, NYMAGIC paid Majestic Insurance $9.2 million to assume losses that were reasonably and accurately estimated to be far in excess of that amount.

60. As a result of the Novation, the Defendants knowingly, recklessly and in bad faith obligated Majestic Insurance to assume reinsurance obligations that the Defendants knew or should have known were very high-risk and that were certain to expose Majestic Insurance to losses that would be much greater than it could bear.

61. In complete disregard of Majestic Insurance's financial interest and well-being, the Defendants approved the Novation and forced Majestic Insurance to assume NYMAGIC's ever-increasing exposure relating to the GSITs. Further, the Defendants knowingly, recklessly and in bad faith utilized flawed actuarial methodologies to support the transaction even though they knew of and consciously disregarded facts showing that those methodologies materially understated the losses that Majestic Insurance assumed as a result of the Novation.

**E. <u>Majestic Insurance's Chief Financial Officer and Actuary Resign, But the Defendants Disregard the Very Serious Concerns They Raise</u>.**

62. Following the acquisition of Majestic Insurance, and seeking an immediate increase in premium revenue, the Defendants immediately sought to expand Majestic Insurance's business, which at the time was based only on the West Coast, by causing it to start writing workers' compensation insurance directly for high-risk employers in New York and New Jersey, utilizing a New York-based sales staff whose members paid little or no attention to Majestic Insurance's pre-existing underwriting policies. Nearly 35% of the new policies that Majestic Insurance underwrote in 2007 and 2008 involved New York and New Jersey businesses.

63. On May 4, 2007, two days after the Board approved the Novation, Majestic Insurance's Chief Financial Officer, Stewart, sent a strongly worded email to Scardino and Walczyk in which he voiced serious concerns regarding the post-acquisition dismantling of

Majestic Insurance's established underwriting polices by or at the behest of the Defendants. In his email, Stewart stated:

> As I indicated to you a week or so ago, I am becoming more and more concerned that our underwriting standards are rapidly changing from what they were when the sale closed. If this is the strategic direction CRM intends for Majestic to take, then it needs to make it clear to the Majestic management group that there has been a material change in the way in which we underwrite business at Majestic. What we are seeing today is a different underwriting philosophy than what we communicated to AM Best and the [CDI] at the time of the sale.
>
> We assured both that the underwriting philosophy would not change under CRM's ownership and that Majestic would control the underwriting decisions. The examples of a departure from this are numerous. Not the least of which is Tom Spendley doing the underwriting in New Jersey and writing risks that do not adhere to the underwriting standards we have in place at Majestic . . . I can go on with more examples of departures from the underwriting policies and practices that were in place when you purchased Majestic, and there are many, but the point is it has changed and continues to change.
>
> I have heard of a number of instances where the underwriters have complained of undue pressure from the sales staffs who threaten to go directly to Chet, every time if they turn an account down or disagree with the sales rep. If this is occurring, it is totally unacceptable and in my opinion a material weakness in the internal controls within our operating departments . . . As CFO of Majestic, and responsible for Majestic's financial health, I have had no conversations nor am I aware that our underwriters and pricing model analyst have had any conversations about subsidizing [a New York-based GSIT]. As CFO of Majestic Jim, one of my responsibilities is to make you, CRM management, and the Board of Directors aware of anything that threatens the financial health of Majestic or is a departure from our approved operating practices such as overriding or attempting to override controls. If the above noted exceptions to our policy are going to be the standard . . . then we need to change our current approved practices, and disclose to the [CDI] in the operating plan we are about to submit the new underwriting practices. . . .

64. Stewart was not the only Majestic Insurance employee who was concerned about the changes that were being made to Majestic Insurance's underwriting practices. Grace Pan, Majestic Insurance's Controller, commended Stewart in an email the same day, stating, "Jay: This is a great job that you just did."

65. As Stewart's email made clear, the underwriting guidelines were being overridden at the direction of the East Coast-based Defendants and individuals who were employees of other companies in the Majestic Capital corporate family. This overriding of the underwriting

guidelines constituted a threat to Majestic Insurance's financial health and seriously compromised its standing with A.M. Best and the CDI. In fact, the sub-standard quality of the New York and New Jersey business underwritten in 2007 and 2008 ultimately would cause massive losses at Majestic Insurance and would be a substantial contributing factor to its downfall.

66. Stewart's email should have caused Scardino and Walczyk, who had become members of the Board, to take steps to protect Majestic Insurance's financial welfare. Nevertheless, acting in disregard of their fiduciary duties and out of misguided allegiance to Hickey Jr. and Hickey Sr., they totally ignored Stewart's warnings and concerns.

67. On June 1, 2007, with Stewart's concerns still unaddressed, Milliman, Inc. ("**Milliman**"), Majestic Insurance's long-time actuary, suddenly resigned. In an email dated that day, Stewart informed Scardino of Milliman's resignation as follows:

> [Guy Avagliano of Milliman] informed me that the Milliman firm has resigned from the Majestic account effective immediately. He said they are a risk averse firm and a number of things when taken as a whole have resulted in their decision to resign from the account. For starters, he did not have a favorable reaction to his . . . meeting with Danny a couple of months ago in which Danny suggested that [Avagliano] might be the appointed actuary on the whole account, was contingent on a favorable outcome of the work his partners were doing on the [GSITs]. Another key reason was what they understood would be the underwriting policy at Majestic after the sale to CRM is in fact different than their [A.M. Best's and the CDI's] understanding. You and I have discussed in detail what those differences are. Another key factor is the lack of credibility of the actuary you use for Twin Bridges and the [GSITs]. This has become an even bigger issue now with the novation pending before the [CDI] given the fact that Guy must consider the impact of the novation on Majestic's reserve adequacy, and the only reserve analysis before the [CDI] currently is from an actuary who in Milliman's eyes lacks credibility. He has been unable to date to get the data he has requested for the [GSITs] to do his analysis; both loss and premiums. These concerns coupled with John [Sullivan's] departure and the drop in the stock price has resulted in a decision . . . to resign.

68. Milliman's resignation, and the circumstances in which it occurred, should have caused Scardino, as well as the other Defendants, who knew or should have known of the resignation, to address the situation immediately. Once again, the Defendants took no action.

69. Ten days later, frustrated and concerned that he had received no meaningful

response to his previously voiced concerns, Stewart resigned as Majestic Insurance's Chief Financial Officer.

70. By email dated June 11, 2007, Stewart submitted a *Whistleblower Letter and Notice Pursuant to Section 9(e) of Jay Stewart's Employment Agreement of Termination of Employment by Executive for Good Cause* (the "**Whistleblower Letter**"). Stewart stated in his email that he was exercising his responsibility under the Code of Business Conduct and Ethics by reporting violations thereof in accordance with Majestic Insurance's Whistleblower Policy.

71. Stewart noted in his email that "these are issues I have already tried to raise, accordingly going to all channels but to no avail, and therefore I have given notice." He noted further, "There a number of issues that I believe require immediate and full disclosure to agencies such as regulatory ratings agencies, banking institutions, etc. that the company needs to address and correct immediately."

72. Stewart's email and the Whistleblower Letter were provided to Hickey Jr., Scardino, Walczyk, Taylor and Hynes. Ultimately, Birsner and Hickey Sr. were also made aware of and were provided with a copy of the Whistleblower Letter.

73. In the Whistleblower Letter, Stewart raised serious concerns regarding the Novation, the ongoing practice of overriding the underwriting standards and Milliman's resignation. Stewart noted that he had "always attended Board meetings at [Majestic Insurance] prior to its acquisition . . . Now, my attendance is selective. Specifically, I was not included in a Company Board meeting held on May 2, 2007 in which the Board approved a material contract impacting the Company's financials and requiring Board approval. Had I been included, I would have shared that I do not think that the contract is in the Company's best interests."

74. Stewart also questioned the handling of certain disclosure issues, including "the failure to disclose an 18 cents per share overstatement in earnings guidance due to a spreadsheet error and failure to disclose to the [CDI] that the actuarial analysis underlying the novation request pending approval before the [CDI] was prepared by an actuary whose credibility is challenged by our own external auditors (Johnson Lambert) and who is being terminated by CRM." In addition, Stewart noted the failure to disclose that "Milliman (Majestic's appointed

actuary) abruptly resigned from the engagement [on] June 1, 2007."

75. Stewart further documented that his "ability to perform [his] job has been compromised by . . . CEO's apparent pressuring of Company employees to manage earnings," that Hickey Jr. was "pressuring key executives to lower the loss ratio and increase quarterly earnings," and that Hickey Jr. "tried to entice the independent actuary into being the appointed actuary for the entire Company, but suggested that it was contingent on a favorable outcome of the work being done by his partners on the east coast, whom to date had shown an unfavorable result."

76. Stewart also noted that Hickey Jr. and Scardino were "pressuring key employees to foster regulatory approval by June 30, 2007 so that they can book a $2 million gain this quarter," and that this was the "approximate amount of a spreadsheet error of $2.0 million (approximately 18 cents a share) in earnings guidance reaffirmed to the public in the second quarter. Rather than issue an 8k explaining the error, a decision was made . . . not to disclose and try to make the difference up."

77. In addition, Stewart noted that a loan in the amount of $250,000 with favorable terms had been made to a newly hired senior underwriter named James Kilduff ("**Kilduff**"), who after receiving the loan caused Majestic Insurance to write extremely high-risk business that fell well outside of any approved underwriting standards.

78. Finally, and of particular importance, Stewart asserted that his "inability" to perform his role as Chief Financial Officer because "internal controls are routinely being overridden and bypassed." Examples provided by Stewart included:

a. Management was "routinely bypassing underwriting guidelines by a) ignoring the guidelines or b) underwriting [Majestic Insurance] business through CRM" at the direction and control of the Defendants, who were located in New York.

b. A "long-time underwriting executive" had been fired for "daring to question CRM's aggressive sales and underwriting philosophy . . . "

c. The Defendants had ignored his "internal complaints that decisions are being made that are not in the best interests" of Majestic Insurance.

d. Matters were being placed "in the hands of the COO of CRM [*i.e.*

> Walczyk] who does not have experience running a regulated insurance company . . . "

79. Stewart warned that if the issues he raised were "not cured within 30 days" of the date of the Whistleblower Letter, he would consider his termination effective on July 10, 2007.

80. Stewart's concerns went directly to the fiduciary duties that the Defendants owed to Majestic Insurance. The Defendants had a duty to retain—or at least consider retaining—independent outside counsel to investigate the significant matters discussed in the Whistleblower Letter. Instead, it was decided that an internal investigation would be conducted.

81. On June 19 and 20, 2007, Hynes and Philip J. Magnarella ("**Magnarella**"), who was a member of Majestic Capital's board of directors, met with Stewart in San Francisco to discuss the issues raised in the Whistleblower Letter. Upon information and belief, Stewart reiterated his concerns and the reasons for his resignation to Hynes and Magnarella, who professed to be troubled by Stewart's disclosures.

82. Hynes met with Majestic Insurance's auditor, Johnson Lambert & Co., LLP ("**Johnson Lambert**"), at the conclusion of these interviews. According to Johnson Lambert's work papers, Hynes indicated that the Defendants understood that Hickey Jr. was "too aggressive" and that the "Board was aware that they need[ed] to 'manage' Mr. Hickey in the future." Indeed, the Defendants had always known that Hickey Jr. was too aggressive, yet they knowingly and recklessly failed to manage his behavior, and facilitated and enabled it, out of misguided loyalty to, and a fear of challenging, Hickey Jr. and Hickey Sr., all in contravention of their fiduciary duties to act independently and in the best interests of Majestic Insurance.

83. On August 6, 2007, more than six weeks after meeting with Stewart and Johnson Lambert, Hynes reported the conclusions of the investigation at a meeting with Hickey Jr., Scardino, Taylor and Walczyk. With Hickey Jr. present and with the minutes being recorded, Hynes omitted any mention of the conclusion that Hickey Jr. was "too aggressive" and needed to be "managed." Instead, without elucidating, Hynes stated only that "there [were] genuine differences in business strategy and business practice between Jay Stewart and senior management" of Majestic Insurance and the related entities, but that "none of the assertions made by Jay Stewart indicates illegal or unethical conduct." Hynes stated that "he believed Mr.

Stewart wrote the [Whistleblower] Letter because he wanted Majestic [Insurance] to operate differently."

84. The minutes from the meeting reflect that the Defendants who were present sat silent upon learning of the investigation's vague conclusions of "differences" in "business practices." Moreover, at a full meeting of the Board that took place the following day, with all of the Defendants in attendance, the Defendants, all of whom were aware of the Whistleblower Letter and who were apprised of the results of the so-called investigation, knowingly and recklessly failed to mention or discuss the Whistleblower Letter or the investigation.

85. The Whistleblower Letter raised very serious concerns regarding Majestic Insurance's management and its reckless business practices, which practices ultimately resulted in Majestic Insurance's demise. Stewart understood that immediate action was necessary to protect Majestic Insurance from additional harm, and was willing to remain as its Chief Executive Officer only if the Defendants undertook corrective measures to address his concerns. However, with those concerns ignored, he felt that he had no choice but to resign.

86. The investigation that Hynes and Magnarella performed was simply a charade designed to make it appear as though the Defendants were properly discharging their fiduciary duties. The written report of the investigation is comprised of less than one typewritten page, and the findings therein are conclusory and unsubstantiated. The outcome of the investigation was clearly intended to protect the Defendants from Stewart's extremely serious disclosures.

87. As a result of their receipt of the Whistleblower Letter, the Defendants knew that Hickey Jr. and each of the other Defendants were engaging in conduct that compromised the viability of Majestic Insurance's business, and that the actions of Hickey Jr. and each of the other Defendants were major reasons for the resignations of Majestic Insurance's two highest ranking executives, Sullivan and Stewart, and its long-standing actuary, Milliman. Amongst other things, the Defendants were informed that Hickey Jr. and some of the other Defendants were engaging in earnings management, were overriding critical internal controls and were causing imprudent underwriting decisions to be made under duress or by personnel working in New York under the direction and control of Hickey Jr. and some of the other Defendants, yet none of the

Defendants took corrective measures. Instead of remaining loyal to Majestic Insurance, as they were required to do, the Defendants breached their fiduciary duties by remaining loyal to Hickey Jr., Hickey Sr. and each other.

88. Due to the Defendants' failure to discharge their fiduciary duties properly and to address his serious concerns, Stewart resigned. Scardino immediately replaced Stewart as Chief Financial Officer. With Stewart gone, Hickey Jr. and the other Defendants assumed complete control of Majestic Insurance, and continued to engage in their destructive conduct.

**F. After Dismissing the Whistleblower Letter, the Defendants Continue to Override Majestic Insurance's Internal Controls and Underwriting Standards.**

89. As is noted above, Hickey Jr. and the other Defendants caused Majestic Insurance to issue workers' compensation insurance policies to employers in New York and New Jersey, areas that were well outside of Majestic Insurance's existing markets. During the third quarter of 2007, the Defendants caused approximately 90% of the former members of one New York-based GSIT, which had all but collapsed due to excessive losses, to become insureds of Majestic Insurance; former members of other New York-based GSITs also became insureds of Majestic Insurance. This was done without regard for Majestic Insurance's existing underwriting polices, just as Stewart had reported to the Board. Majestic Insurance's underwriters were forced to approve business generated by New York-based sales personnel who were acting under the direction and control of the Defendants and who were not employees of Majestic Insurance but rather of another of the companies in the Majestic Capital corporate family. The undermining of the role and function of Majestic Insurance's underwriters represented a complete failure of the risk management process, and that ultimately would result in drastic consequences for Majestic Insurance.

90. Causing Majestic Insurance to offer direct insurance to the former GSIT members without following proper underwriting procedures, without carefully assessing each member's loss history and without inquiring about the effect that doing so would have upon Majestic Insurance's business, when the Defendants knew the former GSIT members' prior claims histories and experience, was utterly reckless. As reflected in a forensic analysis of one GSIT,

110 of the former members had loss ratios that exceeded 100%, meaning that their losses exceeded the premiums they paid. This extremely high-risk business exposed Majestic Insurance to losses that its internal underwriting guidelines were designed to prevent. However, the losses on these policies would not fully manifest themselves for a number of years.

91. In other words, contrary to the representations that had been made to the CDI and notwithstanding Stewart's clear warnings, the Defendants knowingly and recklessly effectuated a drastic change to Majestic Insurance's business that substantially increased Majestic Insurance's exposure to losses.

92. The Defendants' reckless behavior was not lost on Majestic Insurance's auditor, Johnson Lambert, which documented "significant deficiencies regarding documentation of underwriting and claims policies, procedures and controls for non-traditional business including new business" of Majestic Insurance.

93. As additional evidence of the significant deficiency in internal controls that existed, during the third quarter of 2007, Johnson Lambert noted unusual activity involving James Kilduff ("**Kilduff**"), whom the Defendants had hired during the second quarter of 2007 to serve as Majestic Insurance's Senior Vice President, Excess and Reinsurance Underwriting. Kilduff caused Majestic Insurance to issue policies that did not comport with Majestic Insurance's existing underwriting standards, including a $16 million assumed reinsurance contract to the Specialty Insurance Company of Hawaii, which was issued during the second quarter of 2007 but was not disclosed to Majestic Insurance's internal accounting department until the third quarter, after Stewart resigned.

94. With the Whistleblower Letter still fresh in their minds, the concerns that Johnson Lambert raised should have caused the Defendants to take immediate corrective action. No such action was taken, however, and Stewart's and Johnson Lambert's concerns were ignored.

**G. Majestic Insurance's Financial Condition Deteriorates as Losses Mount, Resulting in the Initiation of the Conservation Proceeding.**

95. As a result of the Defendants' wrongful conduct, Majestic Insurance was saddled with a book of bad business that would cause it to sustain massive losses. By early 2008, just

eighteen months after the acquisition, the Defendants' acts and failures to act had caused Majestic Insurance to become a severely weakened company. At that time, due to the decline in the market value of Majestic Capital's stock and the limited capital that was available to fund any future growth, A.M. Best placed Majestic Insurance under review with negative implications. A.M. Best also placed the "BBB-" credit ratings of Majestic Capital, Majestic USA and Embarcadero under review with negative implications.

96. The Defendants' wrongful conduct and the resulting actions taken by A.M. Best directly and negatively affected Majestic Insurance's financial position, in that Majestic Insurance's ability to write premiums on quality business was compromised, and it was required to seek an alternative source of reinsurance, resulting in a material loss of reinsurance premium revenue. The negative domino effect is seen in Johnson Lambert's quarterly review work papers, which reflect that Majestic Insurance experienced a decline in premiums attributable "to the less than favorable news" related to Majestic Capital.

97. Moreover, to address Majestic Insurance's deteriorating financial condition and capital position, and to salvage Majestic Insurance's A.M. Best rating, Majestic USA contributed approximately $34.5 million to Majestic Insurance. This effort to "prop up" Majestic Insurance only served to assuage A.M. Best's concerns temporarily, as the wave of losses resulting from the Defendants' overriding of the underwriting standards and other failures continued to mount.

98. With losses increasing dramatically, and A.M. Best raising serious concerns about Majestic Insurance's risk management practices and downgrading its ratings, the Defendants had no choice but to acknowledge what should have been clear for some time: Hickey Jr.'s stewardship—which focused exclusively on short-term revenue growth and earnings expectations at the expense of implementing and enforcing underwriting and claims administration policies—was having a devastating effect.

99. In March 2009, Hickey Jr.'s tenure with Majestic Insurance and the other companies in the Majestic Capital corporate family finally came to an end. Scardino, who had been acting as Chief Financial Officer for Majestic Capital and its subsidiaries, replaced Hickey Jr. as Chief Executive Officer of Majestic Capital and Majestic Insurance, and Taylor became

Majestic Insurance's Chief Financial Officer.

100. In an effort to explain a loss of $1.9 million for the 2008 fiscal year and Majestic Insurance's declining business, Scardino, in one of his first acts as Chief Executive Officer, made the following admission in Majestic Capital's 2008 *Annual Report to Shareholders*:

> "[W]e produced unacceptable underwriting results in New York. We established our primary insurance premium base in New York by offering insurance through Majestic [Insurance] to members of some of the self-insured trusts formerly managed in our fee-based operation[.] Looking back, our response was rushed and not appropriately governed by the judgments of our underwriters. We made a poor decision that contributed significantly to a severe operating loss . . . "

101. Although Scardino's admission that the Defendants disregarded Majestic Insurance's underwriters by offering insurance to former GSIT members was accurate, he failed to disclose all of the facts. Specifically, Scardino failed to disclose that the Defendants knew that the New York and New Jersey business was poor business, and that they disregarded the repeated warnings of Stewart, who had informed them that the New York and New Jersey business being written in 2007 was not in Majestic Insurance's best interests and that such business would have severe financial repercussions for Majestic Insurance in the future. Scardino also failed to disclose that the Defendants had several opportunities to prevent the losses that began to surface in 2008 and that continued to grow over the ensuing years, but that they failed to take corrective measures in spite of the fiduciary duties they owed to Majestic Insurance.

102. As a result of the Defendants' wrongful conduct and repeated breaches of their fiduciary duties, Majestic Insurance began a proverbial death spiral. In late 2009, with Majestic Insurance facing increasing losses from the high-risk business that had been written in 2007 and 2008, A.M. Best downgraded Majestic Insurance to "B++" with negative implications, which further impaired Majestic Insurance's ability generate premiums on quality business. In March 2010, A.M. Best again downgraded Majestic Insurance's rating to "B." Majestic Insurance's deteriorating financial condition, together with the A.M. Best downgrades, resulted in the termination of its reinsurance treaties with third-party reinsurance carriers, and required Majestic Insurance to enter into a so-called "fronting arrangement" with AmTrust North America, Inc.

("**AmTrust**"), an "A" rated insurance company, effective as of April 1, 2010, under which AmTrust authorized Majestic Insurance to issue insurance policies of AmTrust-affiliated insurers, subject to Majestic Insurance's agreement to reinsure substantially all of the claims under those policies. In breach of their fiduciary duties to Majestic Insurance, the Defendants failed to recognize the adverse effects that the "fronting arrangement" would have upon Majestic Insurance's revenues and profitability, and were focused too closely upon preserving its customer base instead of making prudent decisions in light of its precarious financial position.

103. The devastating impact of the Defendants' wrongful conduct is reflected in the sharp decline in the consolidated financial condition of Majestic Capital, Majestic Insurance's ultimate parent, in 2008, 2009 and 2010. As reflected in the following charts, Majestic Insurance—which had been profitable for at least five years preceding its acquisition—began to suffer massive losses, which were reflected in Majestic Capital's reported consolidated financial statements in subsequent years:

**Majestic Insurance's Pre-Acquisition Statutory Net Income**

| *Year* | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| ***Net Income ($000s)*** | $3,300 | $2,900 | $4,500 | $8,400 | $8,000 |

**Majestic Capital's Post-Acquisition Reported Consolidated Net Income (Loss)**

| *Year* | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| ***Pre-Tax Net Income ($000s)*** | $20,100 | ($1,400) | ($46,800) | ($48,600) |

104. Scardino admitted in Majestic Capital's 2009 annual report that Majestic Capital's enormous consolidated net loss for 2009 stemmed from the underwriting deficiencies at Majestic Insurance that the Defendants were aware of but repeatedly failed to address:

> [T]he results being reported in this annual report are disappointing . . . 2009 was unquestionably the worst year in financial terms in the history of the Company. We lost $45 million from continuing operations and our

> book value fell by $48 million or 44%. We face the possibility of a lawsuit from the Attorney General . . . [O]ur A.M. Best rating was lowered . . . As we try to understand and explain how the results of our insurance operations deteriorated so quickly, it is clear that some prior risk selection and pricing have adversely developed.

105. The Defendants' failures are also admitted in Majestic Capital's 2010 *Form 10-K*, which was filed in April 2011 and which stated:

> We did not achieve our overall business, financial and shareholder performance expectations for the past several years as a result of the following significant developments which negatively impacted our operating results for the years ended December 31, 2008, 2009, and 2010. Our operating results and these significant developments led to conservation of Majestic Insurance by the [CDI] . . . and may result in our non-insurance companies seeking relief through a filing under the U.S. Bankruptcy Code . . .
>
> * * * *
>
> We entered the New York and New Jersey primary workers['] compensation insurance markets in 2007. We believed our past experience in providing underwriting services for self-insured groups in New York would provide a solid foundation for offering primary insurance through Majestic Insurance in New York and New Jersey. Our decisions to expand into New York and New Jersey and aggressively grow our California business in 2007 and 2008 resulted in our expansion into riskier industries/classes of business and lowering of certain underwriting and pricing standards. Despite corrective actions commencing in 2008, the resulting unfavorable current year loss reserve trends and adverse development of our prior year losses beginning in fiscal year 2009 has significantly contributed to our losses from continuing operations for the years ended December 31, 2010 and 2009.

106. The Defendants had absolutely no basis to believe that they had a "solid foundation" upon which to offer primary insurance, especially after Stewart had warned them that the business being written violated Majestic Insurance's existing underwriting guidelines and put Majestic Insurance at substantial risk. The Defendants' actions and conduct, they having acted in contravention of what they knew or should have known and what Stewart warned of and presaged, constituted breaches of their fiduciary duties to Majestic Insurance.

107. The impact of the Defendants' knowing and reckless breaches of their fiduciary duties is also evidenced in the *Report of Examination of the Majestic Insurance Company as of December 31, 2010* that the CDI prepared (the "**CDI Report**"). The CDI Report reflected

dramatic increases in both losses and loss expense between 2008 and 2010 as the longer-tailed GSIT business that Majestic Insurance reinsured as a result of the Novation and the more recently written direct insurance policies became more seasoned. More specifically, the CDI Report reflected combined loss and loss adjustment ratios of 106% for 2008, 142% for 2009 and 162% for 2010. By contrast, Majestic Insurance's prior five-year average combined ratio was 98.6% through 2005.

108. According to the CDI Report, "the 162% combined ratio of the Company raises significant concerns about management's ability to establish, monitor, or hold their employees accountable to a sustainable business plan." The CDI Report made clear that the Defendants' knowing and reckless failures to address serious control deficiencies and Stewart's concerns resulted in a seriously flawed and unsustainable business at and for Majestic Insurance.

109. Notwithstanding reserve-strengthening efforts undertaken in 2009 and 2010, the CDI concluded that Majestic Insurance's reserves as of December 31, 2010 were understated by approximately $46.4 million. The CDI also determined that for the period ending December 31, 2010, Majestic Insurance's surplus was declining at a rate of approximately $1.5 million per month due to continued underwriting losses, that Majestic Insurance's net cash from operations was a negative $37.5 million as compared to a negative $18.7 million for 2009, that Majestic Insurance's expense ratio was 60% of premiums earned for 2010, as compared to 38% for 2009, and that Majestic Insurance's in-force premiums had dropped from $150 million at December 31, 2009 to approximately $84 million at December 31, 2010. The CDI further determined that based upon the financial examination it conducted and the examination adjustments made to Majestic Insurance's financial statements, Majestic Insurance's risk-based capital ("**RBC**") was $11,527,233, which was less than the minimum required amount by the State of California of $18,842,438, and that as a result, Majestic Insurance's RBC ratio caused it to fall within the mandatory control level RBC under applicable California law. The continuation of Majestic Insurance's business into 2010 and 2011 in the face of these facts, and in the face of Majestic Insurance's significant financial losses, and the Defendants' failure to take appropriate measures to mitigate the losses, constituted additional breaches of the Defendants' fiduciary duties.

110. As is noted above, on April 19, 2011, and as a result of the foregoing, the Commissioner initiated the Conservation Proceeding.

111. The financial ruin that befell Majestic Insurance was not the result of the Defendants' failure to exercise proper business judgment, honest mistakes on the part of the Defendants or external macroeconomic factors. Rather, the destruction resulted from a course of wrongful conduct engaged in by the Defendants over many years, during which the Defendants repeatedly acted with knowledge of the issues and problems discussed above, and with reckless and bad faith disregard for Majestic Insurance's best interests and financial welfare.

112. On April 21, 2011, as a result of the failure of Majestic Insurance at the operational hands of the Defendants and for the reasons behind the initiation of the Conservation Proceeding, the Commissioner, in addition to seeking appointment as the Conservator of Majestic Insurance, sought the Conservation Court's approval of a plan of rehabilitation (the "**Rehabilitation Plan**") for Majestic Insurance. The Rehabilitation Plan was based upon the following three integrated agreements, the intent of which would be to transfer all of Majestic Insurance's business, liabilities and insurance reserve assets to AmTrust, where they would be fully reinsured and protected by sufficient reserves, and be free and clear of the liabilities that threatened Majestic Insurance's ability to meet its policyholder claim obligations:

a. a *Renewal Rights and Asset Purchase Agreement* between the Conservator and AmTrust, pursuant to which the Conservator would sell and assign Majestic Insurance's primary insurance operating assets to AmTrust;

b. a *Loss Portfolio Transfer and Quota Share Agreement*, pursuant to which Majestic Insurance would transfer to a reinsurance affiliate of AmTrust assets equal to the sum of Majestic Insurance's reported statutory liabilities relating to policyholder obligations net of certain reinsurance plus the sum of $26 million, in exchange for which the AmTrust affiliate would reinsure all workers' compensation claim liabilities under policies issued by Majestic Insurance without aggregate limit or exclusion; and

c. a *Reinsurance Administrative Services Agreement*, pursuant to which AmTrust would provide to Majestic Insurance all administrative services performed or required to be performed with respect to Majestic Insurance policies, including premium collection and claims, policy and outward reinsurance administration.

113. On June 2, 2011, the Conservation Court entered an order approving the

Rehabilitation Plan. Several weeks later, the transactions contemplated by the Rehabilitation Plan, including the transfer by Majestic Insurance of the sum of $26 million to AmTrust's affiliate, were closed and the Rehabilitation Plan became effective, thus ending Majestic Insurance's decades-long history as a respected, successful and profitable insurance company.

## IV. **CAUSES OF ACTION.**

### COUNT I
### Breach of Fiduciary Duty
### (As to Hickey Jr.)

114. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

115. Hickey Jr. served as Chairman and Chief Executive Officer of Majestic Insurance. In his capacity as Chairman and Chief Executive Officer, Hickey Jr. bore ultimate responsibility for Majestic Insurance's day-to-day operations, including but not limited to ensuring that Majestic Insurance was operated pursuant to a system of adequate internal controls that addressed the critical operational and underwriting risks that comprised its insurance business, and ensuring that its insurance business was protected by appropriate risk management and loss control practices, including but not limited to strict adherence to previously well-established underwriting guidelines and conservative claims reserving and management.

116. In his capacity as Chairman and Chief Executive Officer of Majestic Insurance, Hickey Jr. owed Majestic Insurance fiduciary duties that required him to carry out his management and oversight responsibilities with loyalty, with due care, and in good faith. Hickey Jr. intentionally and knowingly breached the fiduciary duties he owed to Majestic Insurance, recklessly disregarded those duties under circumstances in which he was or should have been aware of a risk of serious financial and reputational injury to Majestic Insurance, and acted in bad faith and contrary to Majestic Insurance's best interests, by engaging in the conduct set forth herein, including but not limited to:

a. Failing to implement a system of internal controls that was adequate in light of the business conducted by Majestic Insurance and the inherent risks that the nature of its business posed to Majestic Insurance;

b. Failing to implement risk management and loss control practices that were

designed to address the unique underwriting and operational risks that existed and that bore directly upon the ability of Majestic Insurance to operate profitably as a direct provider of workers' compensation insurance and to remain a viable going concern;

c. Creating an operational protocol for Majestic Insurance that ignored sound and proven business practices and that focused on short-term revenue generation and that ignored the long-term consequences of such a course of conduct;

d. Repeatedly ignoring and/or failing to address promptly material weaknesses and/or significant deficiencies in internal controls that existed within Majestic Insurance that were called to his attention by multiple sources;

e. Knowingly and intentionally filling the Board with unqualified individuals (including a family member, friends and business acquaintances) whom he could dominate and control;

f. Instilling and adopting a reckless management culture that emphasized short-term growth at any cost, meeting short-term financial targets, and management of earnings even though he knew and/or recklessly disregarded the fact that these same actions were destructive to Majestic Insurance's long-term financial health, exposed Majestic Insurance to massive losses, liabilities and untoward risks, and could, would and did ultimately destroy Majestic Insurance;

g. Knowingly and/or recklessly taking actions and/or permitting others to take actions that destroyed Majestic Insurance and exposed Majestic Insurance to huge losses, including but not limited to the following:

i. Assuming day-to-day control of Majestic Insurance's insurance operations even though he lacked experience leading an insurance company and even though the CDI's approval of the acquisition of Majestic Insurance was based upon specific representations to the CDI that day-to-day control would remain with Majestic Insurance's existing management, including Sullivan and Stewart;

ii. Forcing Sullivan and Stewart out of Majestic Insurance, notwithstanding the known representations to the CDI that these individuals would remain as officers of Majestic Insurance and had executed employment agreements in furtherance of these representations;

iii. Knowingly and/or recklessly causing Majestic Insurance to enter into the Novation, thereby forcing Majestic Insurance to assume NYMAGIC's significant and increasing exposure to the GSITs based upon economic terms that were grossly unfair to Majestic Insurance, including an assumed loss ratio that Hickey Jr. knew was unreliable and inaccurate, and that actually understated NYMAGIC's true exposure to the GSITs and the exposure that Majestic Insurance was otherwise assuming, and which, therefore, resulted in Majestic Insurance taking on losses that exceeded the premiums of $9.2 million that NYMAGIC transferred to Majestic Insurance in consideration for the assumption of these losses;

iv. Knowingly and/or recklessly failing to make reasonable inquiry with respect to the Novation and whether the transaction was actually in Majestic Insurance's best interests, lacking good faith in participating in

actions that caused Majestic Insurance to enter into the Novation, and causing Majestic Insurance to enter into the Novation in contravention of the duty of loyalty that he owed to Majestic Insurance;

v. Knowingly and/or recklessly failing to solicit the input of Stewart, Majestic Insurance's top financial officer, with respect to the Novation and whether the transaction was actually in Majestic Insurance's best interests, and excluding (or permitting others to exclude) Stewart from the May 2, 2007 meeting during which the Board voted to authorize the transaction;

vi. Disregarding the Whistleblower Letter and the numerous very serious issues and concerns raised therein—concerns that threatened Majestic Insurance's viability and its very existence, and that raised serious management integrity issues;

vii. Knowingly and intentionally overriding Majestic Insurance's existing internal controls and its established underwriting guidelines and practices, notwithstanding Stewart's protestations that this conduct posed a grave financial threat to Majestic Insurance, and notwithstanding prior representations to the CDI that Majestic Insurance's business and underwriting standards would remain unchanged following the acquisition;

viii. Using or permitting others to use threats and/or coercion to force Majestic Insurance's underwriters to authorize business that did not otherwise comply with Majestic Insurance's existing underwriting guidelines;

ix. Causing Majestic Insurance to write high-risk business in New York, New Jersey, California and other states during 2007 and 2008 notwithstanding the fact that Stewart had warned that this business fell well outside Majestic Insurance's existing underwriting guidelines and placed Majestic Insurance at substantial financial risk;

x. Recklessly failing to implement or to cause the implementation of consistent and sound underwriting policies and procedures following Stewart's termination, notwithstanding the fact that Johnson Lambert disclosed the lack of such policies as a "significant deficiency" in internal controls;

xi. Causing Majestic Insurance and/or permitting others to cause Majestic Insurance to insure former GSIT members even though he knew or should have known that the profiles of these members did comport with Majestic Insurance's previous underwriting guidelines and even though he knew these members had poor loss histories, and failing to inquire about the effect that this unwarranted expansion of Majestic Insurance's business would have upon the company;

xii. Knowingly engaging in conduct that was destructive to Majestic Insurance's business reputation, which was integral to its success as an insurer, and that ultimately resulted in downgrades of Majestic Insurance's A.M. Best ratings;

h. Knowingly concealing and perpetuating the Defendants' wrongful conduct and mismanagement of Majestic Insurance through increasingly aggressive and risky behavior that subjected Majestic Insurance to greater financial risk and harm over time;

i. Recklessly failing to recognize the adverse effects that the "fronting arrangement" with AmTrust would and did have upon Majestic Insurance's revenues and profitability, and focusing too closely upon preserving its customer base instead of making prudent decisions in light of its precarious financial position; and

j. Knowingly and recklessly continuing Majestic Insurance's business into 2010 and 2011 notwithstanding and in the face of the facts that came to light in the CDI Report, and notwithstanding and in the face of Majestic Insurance's significant financial losses, and knowingly and recklessly failing to take appropriate measures to mitigate the losses.

117. As a direct and proximate result of Hickey Jr.'s wrongful conduct and breaches of his fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

## COUNT II
## Aiding and Abetting Breach of Fiduciary Duty
## (As to Hickey Jr.)

118. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

119. As alleged herein, each of the other Defendants owed fiduciary duties of loyalty, due care, and good faith to Majestic Insurance and each breached such fiduciary duties.

120. Hickey Jr. knowingly induced the other Defendants to breach the fiduciary duties each of them owed to Majestic Insurance and/or participated with the other Defendants in breaching their fiduciary duties by, amongst other things, engaging in the conduct described in Count I.

121. As a direct and proximate result of Hickey Jr.'s wrongful conduct, including his knowing inducement of and/or participation in the other Defendants' breaches of their respective fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**<u>COUNT III</u>**
**Gross Negligence**
**(As to Hickey Jr.)**

122. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

123. As Chairman and Chief Executive Officer of Majestic Insurance, Hickey Jr. owed Majestic Insurance a duty to act with due care in carrying out his responsibilities, including but not limited to those responsibilities described in Counts I and II.

124. As described in Counts I and II, Hickey Jr. breached that standard of care by acting with gross negligence and with a reckless and/or knowing disregard for Majestic Insurance's financial well-being, taking actions that he knew, or absent his gross negligence and recklessness, he would and should have known, affirmatively and directly placed Majestic Insurance on the path to financial harm and eventual destruction.

125. As a direct and proximate cause of Hickey Jr.'s grossly negligent and/or reckless conduct, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**<u>COUNT IV</u>**
**Breach of Fiduciary Duty**
**(As to Scardino)**

126. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

127. Scardino served as a Director, Chief Executive Officer (following the departure of Hickey Jr.), Chief Financial Officer and Executive Vice President of Majestic Insurance. Scardino's duties included but were not limited to having day-to-day responsibility over Majestic Insurance, ensuring that adequate internal controls over Majestic Insurance's financial reporting existed, and ensuring that Majestic Insurance was adequately addressing the critical operational and underwriting risks that existed in its insurance business through, amongst other things, the implementation of conservative financial reporting.

128. In his capacity as a Director, Chief Executive Officer, Chief Financial Officer and Executive Vice President of Majestic Insurance, Scardino owed Majestic Insurance fiduciary

duties that required him to carry out his management and oversight responsibilities with loyalty, with due care, and in good faith. Scardino intentionally and knowingly breached the fiduciary duties he owed to Majestic Insurance, recklessly disregarded those duties under circumstances in which he knew or should have been aware of a risk of serious financial and reputational injury to Majestic Insurance, and acted in bad faith and contrary to Majestic Insurance's best interests, by engaging in the conduct set forth herein, including but not limited to:

a. Failing to implement a system of internal controls that was adequate in light of the business conducted by Majestic Insurance and the inherent risks that the nature of its business posed to Majestic Insurance;

b. Failing to implement risk management and loss control practices that were designed to address the unique underwriting and operational risks that existed and that bore directly upon the ability of Majestic Insurance to operate profitably as a direct provider of workers' compensation insurance and to remain a viable going concern;

c. Creating and/or permitting others to create an operational protocol for Majestic Insurance that ignored sound and proven business practices and that focused on short-term revenue generation and that ignored the long-term consequences of such a course of conduct;

d. Repeatedly ignoring and/or failing to address promptly material weaknesses and/or significant deficiencies in internal controls that existed within Majestic Insurance that were called to his attention by multiple sources;

e. Blindly and unquestioningly following the direction and leadership of Hickey Jr. and acquiescing in the reckless management culture that he instilled and adopted, which emphasized short-term growth at any cost, meeting short-term financial targets, and management of earnings even though he knew and/or recklessly disregarded the fact that these same actions were destructive to Majestic Insurance's long-term financial health, exposed Majestic Insurance to massive losses, liabilities and untoward risks, and could, would and did ultimately destroy Majestic Insurance;

f. Knowingly and/or recklessly taking actions and/or permitting others to take actions that destroyed Majestic Insurance and exposed Majestic Insurance to huge losses, including but not limited to the following:

i. Permitting Hickey Jr. to assume day-to-day control of Majestic Insurance even though he knew Hickey Jr. lacked experience serving as CEO of an insurance company and even though the CDI's approval of the acquisition of Majestic Insurance was based upon specific representations to the CDI that day-to-day control would remain with Majestic Insurance's existing management, including Sullivan and Stewart;

ii. Forcing Sullivan and Stewart out of Majestic Insurance and/or permitting Hickey Jr. and others to force them out, notwithstanding the known

representations to the CDI that these individuals would remain as officers of Majestic Insurance and had executed employment agreements in furtherance of these representations;

iii. Knowingly and/or recklessly causing Majestic Insurance to enter into the Novation, thereby forcing Majestic Insurance to assume NYMAGIC's significant and increasing exposure to the GSITs based upon economic terms that were grossly unfair to Majestic Insurance, including an assumed loss ratio that Scardino knew was unreliable, inaccurate, and actually understated NYMAGIC's true exposure to the GSITs and the exposure that Majestic Insurance was otherwise assuming and which, therefore, resulted in Majestic Insurance taking on losses that exceeded the premiums of $9.2 million that NYMAGIC transferred to Majestic Insurance in consideration for the assumption of these losses;

iv. Knowingly and/or recklessly failing to make reasonable inquiry with respect to the Novation and whether the transaction was actually in Majestic Insurance's best interests, lacking good faith in participating in actions that caused Majestic Insurance to enter into the Novation, and causing Majestic Insurance to enter into the Novation in contravention of the duty of loyalty that he owed to Majestic Insurance;

v. Knowingly and/or recklessly failing to solicit the input of Stewart, Majestic Insurance's top financial officer, with respect to the Novation and whether the transaction was actually in Majestic Insurance's best interests, and excluding (or permitting others to exclude) Stewart from the May 2, 2007 meeting during which the Board voted to authorize the transaction;

vi. Disregarding the Whistleblower Letter and the numerous very serious issues and concerns raised therein—concerns that threatened Majestic Insurance's viability and its very existence, and that raised serious management integrity issues;

vii. Preparing a response to the Whistleblower Letter that contained numerous inaccuracies and falsehoods in an effort to discredit and downplay Stewart's concerns, and providing that response to the Defendants, who in turn recklessly accepted that response without any consideration as to its accuracy;

viii. Knowingly and intentionally overriding Majestic Insurance's existing internal controls and its established underwriting guidelines and practices, notwithstanding Stewart's protestations that this conduct posed a grave financial threat to Majestic Insurance, and notwithstanding prior representations to the CDI that Majestic Insurance's business and underwriting standards would remain unchanged following the acquisition;

ix. Using or permitting others to use threats and/or coercion to force Majestic Insurance's underwriters to authorize business that did not otherwise comply with Majestic Insurance's existing underwriting guidelines;

x. Causing Majestic Insurance to write high-risk business in New York, New Jersey, California and other states throughout 2007 and 2008

notwithstanding the fact that Stewart had warned that this business fell well outside Majestic Insurance's existing underwriting guidelines and placed Majestic Insurance at substantial financial risk;

xi. Recklessly failing to implement or to cause the implementation of consistent and sound underwriting policies and procedures following Stewart's termination, notwithstanding the fact that Johnson Lambert disclosed the lack of such policies as a "significant deficiency" in internal controls;

xii. Causing Majestic Insurance and/or permitting others to cause Majestic Insurance to insure former GSIT members even though he knew or should have known that the profiles of these members did not comport with Majestic Insurance's previous underwriting guidelines and even though he knew these members had poor loss histories, and failing to inquire about the effect that this unwarranted expansion of Majestic Insurance's business would have upon the company;

xiii. Knowingly engaging in conduct or permitting others, including Hickey Jr., to engage in conduct that was destructive to Majestic Insurance's business reputation, which was integral to its success as an insurer, and that ultimately resulted in downgrades of Majestic Insurance's A.M. Best ratings;

g. Recklessly taking actions that were designed to further the interests of Hickey Jr. and his improper management practices, even when it was clear that those actions were not consistent with the best interests of Majestic Insurance;

h. Recklessly allowing his misguided loyalty to Hickey Jr. and Hickey Sr. to trump the primary duty of loyalty that Scardino owed to Majestic Insurance by, amongst other things, engaging in actions that were designed to facilitate, conceal, justify and/or downplay Hickey Jr.'s overly aggressive management style and the reckless, inappropriate and unethical conduct that flowed therefrom notwithstanding its devastating impact on Majestic Insurance;

i. Knowingly concealing and perpetuating the Defendants' wrongful conduct and administration of Majestic Insurance through increasingly aggressive and risky behavior that subjected Majestic Insurance to greater financial risk and harm over time;

j. Recklessly failing to recognize the adverse effects that the "fronting arrangement" with AmTrust would and did have upon Majestic Insurance's revenues and profitability, and focusing too closely upon preserving its customer base instead of making prudent decisions in light of its precarious financial position; and

k. Knowingly and recklessly continuing Majestic Insurance's business into 2010 and 2011 notwithstanding and in the face of the facts that came to light in the CDI Report, and notwithstanding and in the face of Majestic Insurance's significant financial losses, and knowingly and recklessly failing to take appropriate measures to mitigate the losses.

129. As a direct and proximate result of Scardino's wrongful conduct and breaches of his fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT V**
**Aiding and Abetting Breach of Fiduciary Duty**
**(As to Scardino)**

130. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

131. As alleged herein, each of the other Defendants owed fiduciary duties of loyalty, due care, and good faith to Majestic Insurance and each breached such fiduciary duties.

132. Scardino knowingly induced the other Defendants to breach the fiduciary duties each of them owed to Majestic Insurance and/or participated with the other Defendants in breaching their fiduciary duties by, among other things, engaging in the conduct described in Count IV.

133. As a direct and proximate result of Scardino's wrongful conduct, including his knowing inducement of and/or participation in the other Defendants' breaches of their respective fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT VI**
**Gross Negligence**
**(As to Scardino)**

134. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

135. In his capacity as a Director, Chief Executive Officer, Chief Financial Officer and Executive Vice President of Majestic Insurance, Scardino owed Majestic Insurance a duty to act with due care in carrying out his responsibilities, including but not limited to those responsibilities described in Counts IV and V.

136. As described in Counts IV and V, Scardino breached that standard of care by acting with gross negligence and with a reckless and/or knowing disregard for Majestic Insurance's financial well-being, taking actions that he knew, or absent his gross negligence and

recklessness, he would and should have known, affirmatively and directly placed Majestic Insurance on the path to financial harm and eventual destruction.

137. As a direct and proximate cause of Scardino's grossly negligent and reckless conduct, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

## COUNT VII
### Breach of Fiduciary Duty
### (As to Walczyk)

138. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

139. Walczyk served as a Director, Chief Operating Officer and Executive Vice President of Majestic Insurance. Walczyk's duties as Director, Chief Operating Officer and Executive Vice President of Majestic Insurance included but were not limited to ensuring that Majestic Insurance was protected by an adequate system of internal controls that addressed the critical operational and underwriting risks that existed in its insurance business, and ensuring that its insurance business was protected by appropriate risk management and loss control practices, including but not limited to adherence to strict underwriting guidelines and conservative claims management.

140. In his capacity as a Director, Chief Operating Officer and Executive Vice President of Majestic Insurance, Walczyk owed Majestic Insurance fiduciary duties that required him to carry out his management and oversight responsibilities with loyalty, with due care, and in good faith. Walczyk intentionally and knowingly breached the fiduciary duties he owed to Majestic Insurance, recklessly disregarded those duties under circumstances in which he was or should have been aware of a risk of serious financial and reputational injury to Majestic Insurance, and acted in bad faith and contrary to Majestic Insurance's best interests, by engaging in the conduct set forth herein, including but not limited to:

a. Failing to implement a system of internal controls that was adequate in light of the business conducted by Majestic Insurance and the inherent risks that the nature of its business posed to Majestic Insurance;

b. Failing to implement risk management and loss control practices that were designed to address the unique underwriting and operational risks that existed and that bore directly upon the ability of Majestic Insurance to operate profitably as a direct provider of workers' compensation insurance and to remain a viable going concern;

c. Creating and/or permitting others to create an operational protocol for Majestic Insurance that ignored sound and proven business practices and that focused on short-term revenue generation and that ignored the long-term consequences of such a course of conduct;

d. Repeatedly ignoring and/or failing to address promptly material weaknesses and/or significant deficiencies in internal controls that existed within Majestic Insurance that were called to his attention by multiple sources;

e. Blindly and unquestioningly following the direction and leadership of Hickey Jr. and acquiescing in the reckless management culture that he instilled and adopted, which emphasized short-term growth at any cost, meeting short-term financial targets, and management of earnings even though he knew and/or recklessly disregarded the fact that these same actions were destructive to Majestic Insurance's long-term financial health, exposed Majestic Insurance to massive losses, liabilities and untoward risks, and could, would and did ultimately destroy Majestic Insurance;

f. Knowingly and/or recklessly taking actions and/or permitting others to take actions that destroyed Majestic Insurance and exposed Majestic Insurance to huge losses, including but not limited to the following:

i. Forcing Sullivan and Stewart out of Majestic Insurance and/or permitting Hickey Jr. and others to force them out, notwithstanding the known representations to the CDI that these individuals would remain as officers of Majestic Insurance and had executed employment agreements in furtherance of these representations;

ii. Knowingly and/or recklessly causing Majestic Insurance to enter into the Novation, thereby forcing Majestic Insurance to assume NYMAGIC's significant and increasing exposure to the GSITs based upon economic terms that were grossly unfair to Majestic Insurance, including an assumed loss ratio that Walczyk knew was unreliable, inaccurate, and actually understated NYMAGIC's true exposure to the GSITs and the exposure that Majestic Insurance was otherwise assuming and which, therefore, resulted in Majestic Insurance taking on losses that exceeded the premiums of $9.2 million that NYMAGIC transferred to Majestic Insurance in consideration for the assumption of these losses;

iii. Knowingly and/or recklessly failing to make reasonable inquiry with respect to the Novation and whether the transaction was actually in Majestic Insurance's best interests, lacking good faith in participating in actions that caused Majestic Insurance to enter into the Novation, and causing Majestic Insurance to enter into the Novation in contravention of the duty of loyalty that he owed to Majestic Insurance;

iv. Knowingly and/or recklessly failing to solicit the input of Stewart, Majestic Insurance's top financial officer, with respect to the Novation

and whether the transaction was actually in Majestic Insurance's best interests, and excluding (or permitting others to exclude) Stewart from the May 2, 2007 meeting during which the Board voted to authorized the transaction;

v. Disregarding the Whistleblower Letter and the numerous very serious issues and concerns raised therein—concerns that threatened Majestic Insurance's viability and its very existence, and that raised serious management integrity issues;

vi. Knowingly and intentionally overriding Majestic Insurance's existing internal controls and its established underwriting guidelines and practices, notwithstanding Stewart's protestations that this conduct posed a grave financial threat to Majestic Insurance, and notwithstanding prior representations to the CDI that Majestic Insurance's business and underwriting standards would remain unchanged following the acquisition;

vii. Using or permitting others to use threats and/or coercion to force Majestic Insurance's underwriters to authorize business that did not otherwise comply with Majestic Insurance's existing underwriting guidelines;

viii. Causing Majestic Insurance to write high-risk business in New York, New Jersey, California and other states throughout 2007 and 2008 notwithstanding the fact that Stewart had warned that this business fell well outside Majestic Insurance's existing underwriting guidelines and placed Majestic Insurance at substantial financial risk;

ix. Recklessly failing to implement or to cause the implementation of consistent and sound underwriting policies and procedures following Stewart's termination, notwithstanding the fact that Johnson Lambert disclosed the lack of such policies as a "significant deficiency" in internal controls;

x. Causing Majestic Insurance and/or permitting others to cause Majestic Insurance to insure former GSIT members even though he knew or should have known that the profiles of these members did not comport with Majestic Insurance's previous underwriting guidelines and even though he knew these members had poor loss histories, and failing to inquire about the effect that this unwarranted expansion of Majestic Insurance's business would have upon the company;

xi. Knowingly engaging in conduct or permitting others, including Hickey Jr., to engage in conduct that was destructive to Majestic Insurance's business reputation, which was integral to its success as an insurer, and that ultimately resulted in downgrades of Majestic Insurance's A.M. Best ratings;

g. Recklessly taking actions that were designed to further the interests of Hickey Jr. and his improper management practices even when it was clear that those actions were not consistent with the best interests of Majestic Insurance;

h. Recklessly allowing his misguided loyalty to Hickey Jr. and Hickey Sr. to trump the primary duty of loyalty that Walczyk owed to Majestic Insurance by, amongst

other things, engaging in actions that were designed to facilitate, conceal, justify and/or downplay Hickey Jr.'s overly aggressive management style and the reckless, inappropriate and unethical conduct that flowed therefrom notwithstanding its devastating impact on Majestic Insurance;

i. Knowingly concealing and perpetuating the Defendants' wrongful conduct and mismanagement of Majestic Insurance through increasingly aggressive and risky behavior that subjected Majestic Insurance to greater financial risk and harm over time;

j. Recklessly failing to recognize the adverse effects that the "fronting arrangement" with AmTrust would and did have upon Majestic Insurance's revenues and profitability, and focusing too closely upon preserving its customer base instead of making prudent decisions in light of its precarious financial position; and

k. Knowingly and recklessly continuing Majestic Insurance's business into 2010 and 2011 notwithstanding and in the face of the facts that came to light in the CDI Report, and notwithstanding and in the face of Majestic Insurance's significant financial losses, and knowingly and recklessly failing to take appropriate measures to mitigate the losses.

141. As a direct and proximate result of Walczyk's wrongful conduct and breaches of his fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT VIII**
**Aiding and Abetting Breach of Fiduciary Duty**
**(As to Walczyk)**

142. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

143. As alleged herein, each of the other Defendants owed fiduciary duties of loyalty, due care, and good faith to Majestic Insurance and each breached such fiduciary duties.

144. Walczyk knowingly induced the other Defendants to breach the fiduciary duties each of them owed to Majestic Insurance and/or participated with the other Defendants in breaching their fiduciary duties by, amongst other things, engaging in the conduct described in Count VII.

145. As a direct and proximate result of Walczyk's wrongful conduct, including his knowing inducement of and/or participation in the other Defendants' breaches of their respective fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT IX**
**Gross Negligence**
**(As to Walczyk)**

146. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

147. As a Director, Chief Operating Officer and Executive Vice President of Majestic Insurance, Walczyk owed Majestic Insurance a duty to act with due care in carrying out his responsibilities, including but not limited to those responsibilities described in Counts VII and VIII.

148. As described in Counts VII and VIII, Walczyk breached that standard of care by acting with gross negligence and with a reckless and/or knowing disregard for Majestic Insurance's financial well-being, taking actions that he knew, or absent his gross negligence and recklessness, he would and should have known, affirmatively and directly placed Majestic Insurance on the path to financial harm and eventual destruction.

149. As a direct and proximate cause of Walczyk's grossly negligent and reckless conduct, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT X**
**Breach of Fiduciary Duty**
**(As to Taylor)**

150. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

151. Taylor served as a Director and Chief Financial Officer of Majestic Insurance. Taylor's duties as a Director and Chief Financial Officer of Majestic Insurance included but were not limited to ensuring that appropriate risk management and loss control practices were being utilized on behalf of Majestic Insurance, ensuring that Majestic Insurance was protected by a system of internal controls that addressed the critical operational and underwriting risks that existed in its insurance business, and ensuring that Majestic Insurance was addressing and mitigating the critical operational and underwriting risks through the implementation of conservative financial reporting, including proper reserving and actuarial methodologies.

152. In his capacity as a Director and Chief Financial Officer of Majestic Insurance, Taylor owed Majestic Insurance fiduciary duties that required him to carry out his management and oversight responsibilities with loyalty, with due care, and in good faith. Taylor intentionally and knowingly breached the fiduciary duties he owed to Majestic Insurance, recklessly disregarded those duties under circumstances in which he was or should have been aware of a risk of serious financial and reputational injury to Majestic Insurance, and acted in bad faith and contrary to Majestic Insurance's best interests, by engaging in the conduct set forth herein, including but not limited to:

a. Failing to implement a system of internal controls that was adequate in light of the business conducted by Majestic Insurance and the inherent risks that the nature of its business posed to Majestic Insurance;

b. Failing to implement risk management and loss control practices that were designed to address the unique underwriting and operational risks that existed and that bore directly upon the ability of Majestic Insurance to operate profitably as a direct provider of workers' compensation insurance and remain a viable going concern;

c. Creating and/or permitting others to create an operational protocol for Majestic Insurance that ignored sound and proven business practices and that focused on short-term revenue generation and that ignored the long-term consequences of such a course of conduct;

d. Repeatedly ignoring and/or failing to address promptly material weaknesses and/or significant deficiencies in internal controls that existed within Majestic Insurance that were called to his attention by multiple sources;

e. Blindly and unquestioningly following the direction and leadership of Hickey Jr. and acquiescing in the reckless management culture that he instilled and adopted, which emphasized short-term growth at any cost, meeting short-term financial targets, and management of earnings even though he knew and/or recklessly disregarded the fact that these same actions were destructive to Majestic Insurance's long-term financial health, exposed Majestic Insurance to massive losses, liabilities and untoward risks, and could, would and did ultimately destroy Majestic Insurance;

f. Knowingly and/or recklessly taking actions and/or permitting others to take actions that destroyed Majestic Insurance and exposed Majestic Insurance to huge losses, including but not limited to the following:

i. Knowingly and/or recklessly causing (or permitted others to cause) Majestic Insurance to enter into the Novation, thereby forcing Majestic Insurance to assume NYMAGIC's significant and increasing exposure to the GSITs based upon economic terms that were grossly unfair to Majestic Insurance, including an assumed loss ratio that Taylor knew or should

have known was unreliable, inaccurate, and actually understated NYMAGIC's true exposure to the GSITs and the exposure that Majestic Insurance was otherwise assuming and which, therefore, resulted in Majestic Insurance taking on losses that exceeded the premiums of $9.2 million that NYMAGIC transferred to Majestic Insurance in consideration for the assumption of these losses;

ii. Knowingly and/or recklessly failing to make reasonable inquiry with respect to the Novation and whether the transaction was actually in Majestic Insurance's best interests, lacking good faith in participating in actions that caused Majestic Insurance to enter into the Novation, and causing Majestic Insurance to enter into the Novation in contravention of the duty of loyalty that he owed to Majestic Insurance;

iii. Knowingly and/or recklessly failing to solicit the input of Stewart, Majestic Insurance's top financial officer, with respect to the Novation and whether the transaction was actually in Majestic Insurance's best interests, and excluding (or permitting others to exclude) Stewart from the May 2, 2007 meeting during which the Board voted to authorize the transaction;

iv. Disregarding the Whistleblower Letter and the numerous very serious issues and concerns raised therein—concerns that threatened Majestic Insurance's viability and its very existence, and that raised serious management integrity issues;

v. Knowingly and intentionally overriding Majestic Insurance's existing internal controls and its established underwriting guidelines and practices, notwithstanding Stewart's protestations that this conduct posed a grave financial threat to Majestic Insurance, and notwithstanding prior representations to the CDI that Majestic Insurance's business and underwriting standards would remain unchanged following the acquisition;

vi. Using or permitting others to use threats and/or coercion to force Majestic Insurance's underwriters to authorize business that did not otherwise comply with Majestic Insurance's existing underwriting guidelines;

vii. Causing Majestic Insurance to write high-risk business in New York, New Jersey, California and other states throughout 2007 and 2008 notwithstanding the fact that Stewart had warned that this business fell well outside Majestic Insurance's existing underwriting guidelines and placed Majestic Insurance at substantial financial risk;

viii. Recklessly failing to implement or to cause the implementation of consistent and sound underwriting policies and procedures following Stewart's termination, notwithstanding the fact that Johnson Lambert disclosed the lack of such policies as a "significant deficiency" in internal controls;

ix. Causing Majestic Insurance and/or permitting others to cause Majestic Insurance to insure former GSIT members even though he knew or should have known that the profiles of these members did not comport with Majestic Insurance's previous underwriting guidelines and even though he

knew these members had poor loss histories, and failing to inquire about the effect that this unwarranted expansion of Majestic Insurance's business would have upon the company;

x. Knowingly engaging in conduct or permitting others, including Hickey Jr., to engage in conduct that was destructive to Majestic Insurance's business reputation, which was integral to its success as an insurer, and that ultimately resulted in downgrades of Majestic Insurance's A.M. Best ratings;

g. Recklessly taking actions that were designed to further the interests of Hickey Jr. and his improper management practices even when it was clear that those actions were not consistent with the best interests of Majestic Insurance;

h. Recklessly allowing his misguided loyalty to Hickey Jr. and Hickey Sr. to trump the primary duty of loyalty that Taylor owed to Majestic Insurance by, amongst other things, engaging in actions that were designed to facilitate, conceal, justify and/or downplay Hickey Jr.'s overly aggressive management style and the reckless, inappropriate and unethical conduct that flowed therefrom notwithstanding its devastating impact on Majestic Insurance

i. Knowingly concealing and perpetuating the Defendants' wrongful conduct and mismanagement of Majestic Insurance through increasingly aggressive and risky behavior that subjected Majestic Insurance to greater financial risk and harm over time;

j. Recklessly failing to recognize the adverse effects that the "fronting arrangement" with AmTrust would and did have upon Majestic Insurance's revenues and profitability, and focusing too closely upon preserving its customer base instead of making prudent decisions in light of its precarious financial position; and

k. Knowingly and recklessly continuing Majestic Insurance's business into 2010 and 2011 notwithstanding and in the face of the facts that came to light in the CDI Report, and notwithstanding and in the face of Majestic Insurance's significant financial losses, and knowingly and recklessly failing to take appropriate measures to mitigate the losses.

153. As a direct and proximate result of Taylor's wrongful conduct and breaches of his fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT XI**
**Aiding and Abetting Breach of Fiduciary Duty**
**(As to Taylor)**

154. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

155. As alleged herein, each of the other Defendants owed fiduciary duties of loyalty, due care, and good faith to Majestic Insurance and each breached such fiduciary duties.

156. Taylor knowingly induced the other Defendants to breach the fiduciary duties each of them owed to Majestic Insurance and/or participated with the other Defendants in breaching their fiduciary duties by, amongst other things, engaging in the conduct described in Count X.

157. As a direct and proximate result of Taylor's wrongful conduct, including his knowing inducement of and/or participation in the other Defendants' breaches of their respective fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT XII**
**Gross Negligence**
**(As to Taylor)**

158. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

159. As a Director and Chief Financial Officer of Majestic Insurance, Taylor owed Majestic Insurance a duty to act with due care in carrying out his responsibilities, including but not limited to those responsibilities described in Counts X and XI.

160. As described in Counts X and XI, Taylor breached that standard of care by acting with gross negligence and with a reckless and/or knowing disregard for Majestic Insurance's financial well-being taking actions that he knew, or absent his gross negligence and recklessness, he would and should have known, affirmatively and directly placed Majestic Insurance on the path to financial harm and eventual destruction.

161. As a direct and proximate cause of Taylor's grossly negligent and reckless conduct, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT XIII**
**Breach of Fiduciary Duty**
**(As to Hickey Sr.)**

162. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

163. Hickey Sr. served as Director of Majestic Insurance, and in that capacity had

direct oversight responsibilities over the management and affairs of Majestic Insurance.

164. In his capacity as a Director of Majestic Insurance, Hickey Sr. owed Majestic Insurance fiduciary duties that required him to carry out his management and oversight responsibilities with loyalty, with due care, and in good faith. Hickey Sr. intentionally and knowingly breached the fiduciary duties he owed to Majestic Insurance, recklessly disregarded those duties under circumstances in which he was or should have been aware of a risk of serious financial and reputational injury to Majestic Insurance, and acted in bad faith and contrary to Majestic Insurance's best interests, by engaging in the conduct set forth herein, including but not limited to:

a. Failing to implement (or to cause management to implement) a system of internal controls that was adequate in light of the business conducted by Majestic Insurance and the inherent risks that the nature of its business posed to Majestic Insurance;

b. Failing to implement (or to cause management to implement) risk management and loss control practices that were designed to address the unique underwriting and operational risks that existed and that bore directly upon the ability of Majestic Insurance to operate profitably as a direct provider of workers' compensation insurance and to remain a viable going concern;

c. Creating and/or permitting others to create an operational protocol for Majestic Insurance that ignored sound and proven business practices and that focused on short-term revenue generation and that ignored the long-term consequences of such a course of conduct;

d. Repeatedly ignoring and/or recklessly failing to resolve promptly (or cause others to resolve promptly) the material weaknesses and/or significant deficiencies in internal controls that existed within Majestic Insurance that were called to his attention by multiple sources;

e. Blindly and unquestioningly following the direction and leadership of Hickey Jr. and acquiescing in the reckless management culture that he instilled and adopted, which emphasized short-term growth at any cost, meeting short-term financial targets, and management of earnings even though he knew and/or recklessly disregarded the fact that these same actions were destructive to Majestic Insurance's long-term financial health, exposed Majestic Insurance to massive losses, liabilities and untoward risks, and could, would and did ultimately destroy Majestic Insurance;

f. Knowingly and/or recklessly taking actions and/or permitting others to take actions that destroyed Majestic Insurance and exposed Majestic Insurance to huge losses, including but not limited to the following:

i. Permitting Hickey Jr. to assume day-to-day control of Majestic Insurance

notwithstanding his lack of experience leading an insurance company, his known aggressive management style, and notwithstanding representations to the CDI that day-to-day control would remain with Majestic Insurance's existing management, including Sullivan and Stewart;

ii. Permitting Hickey Jr. and others to force Sullivan and Stewart out of Majestic Insurance, notwithstanding the known representations to the CDI that these individuals would remain as officers of Majestic Insurance and had executed employment agreements in furtherance of these representations, and recklessly disregarding the impact that their departures would have on Majestic Insurance;

iii. Knowingly and/or recklessly causing Majestic Insurance to enter into the Novation, thereby forcing Majestic Insurance to assume NYMAGIC's significant and increasing exposure to the GSITs based upon economic terms that were grossly unfair to Majestic Insurance, including an assumed loss ratio that Hickey Sr. knew or should have known was unreliable, inaccurate, and actually understated NYMAGIC's true exposure to the GSITs and the exposure that Majestic Insurance was otherwise assuming and which, therefore, resulted in Majestic Insurance taking on losses that exceeded the premiums of $9.2 million that NYMAGIC transferred to Majestic Insurance in consideration for the assumption of such losses;

iv. Knowingly and/or recklessly failing to make reasonable inquiry with respect to the Novation and whether the transaction was actually in Majestic Insurance's best interests, lacking good faith in participating in actions that caused Majestic Insurance to enter into the Novation, and causing Majestic Insurance to enter into the Novation in contravention of the duty of loyalty that he owed to Majestic Insurance;

v. Knowingly and/or recklessly failing to solicit the input of Stewart, Majestic Insurance's top financial officer, with respect to the Novation and whether the transaction was actually in Majestic Insurance's best interests, and excluding (or permitting others to exclude) Stewart from the May 2, 2007 meeting during which the Board voted to authorize the transaction;

vi. Disregarding the Whistleblower Letter and the numerous very serious issues and concerns raised therein—concerns that threatened Majestic Insurance's very existence and that raised serious management integrity issues;

vii. Authorizing Hynes and Magnarella to lead a supposedly "independent" investigation of the Whistleblower Letter even though Hickey Sr., Hynes and Magnarella had close personal relationships with Hickey Jr. and Scardino, which gave rise to a conflict of interest that would otherwise taint and bias the investigation;

viii. Knowingly or recklessly disregarding the fact that the Whistleblower Letter investigation would be and, in fact, was conducted in a manner that was designed to trivialize Stewart's concerns and to protect the interests of Hickey Jr. and the Defendants rather than to protect the interests of Majestic Insurance and, to the extent that Hynes and Magnarella relied heavily upon on representations made by Scardino—who was a friend of

Hynes—Hickey Sr. knew or, absent his own recklessness would have known, that many of these representations had been contradicted by Stewart, who had no agenda other than to protect Majestic Insurance's financial well-being;

ix. Perpetuating and concealing the Defendants' wrongful conduct by failing to document properly (or to require the proper documentation of) the facts discovered in the course of the Whistleblower Letter investigation that Hynes and Magnarella performed;

x. Dismissing Stewart's concerns as mere "differences" in style and strategy, and refusing to probe into the substance of the "differences" that actually existed;

xi. Knowing and/or recklessly failing to acknowledge that the issues raised by Stewart were serious management integrity concerns that threatened Majestic Insurance's very existence, and turning a blind eye to those issues;

xii. Knowingly and/or recklessly permitting the Defendants to override Majestic Insurance's existing internal controls and its established underwriting guidelines and practices, notwithstanding Stewart's protestations that this conduct posed a grave financial threat to Majestic Insurance, and notwithstanding prior representations to the CDI that Majestic Insurance's business and underwriting standards would remain unchanged following the acquisition;

xiii. Knowingly and/or recklessly permitting the Defendants to use threats and/or coercion to force Majestic Insurance's underwriters to authorize business that did not otherwise comply with Majestic Insurance's existing underwriting guidelines;

xiv. Knowingly and/or recklessly permitting the Defendants to write high-risk business in New York, New Jersey, California and other states throughout 2007 and 2008, notwithstanding the fact that Stewart had warned that this business fell well outside Majestic Insurance's existing underwriting guidelines and placed Majestic Insurance at substantial financial risk;

xv. Knowingly and/or recklessly failing to implement or to cause the implementation of consistent and sound underwriting policies and procedures following Stewart's termination, notwithstanding the fact that Johnson Lambert disclosed the lack of such policies as a "significant deficiency" in internal controls;

xvi. Knowingly and/or recklessly permitting the Defendants to cause Majestic Insurance to insure former GSIT members even though he knew or should have known that the profiles of these members did not comport with Majestic Insurance's previous underwriting guidelines and even though he knew these members had poor loss histories, and failing to inquire about the effect that this unwarranted expansion of Majestic Insurance's business would have upon the company;

xvii. Knowingly engaging in conduct or permitting others, including Hickey Jr., to engage in conduct that was destructive to Majestic Insurance's business reputation, which was integral to its success as an insurer;

g. Knowingly and/or recklessly taking actions in a manner designed to further the interests of Hickey Jr. and his improper management practices, even when it was clear that those actions were not consistent with the best interests of Majestic Insurance;

h. Recklessly allowing his misguided loyalty to his son, Hickey Jr., to trump the primary duty of loyalty that Hickey Sr. owed to Majestic Insurance by, amongst other things, engaging in actions that were designed to facilitate, conceal, justify and/or downplay his son's overly aggressive management style and the reckless, inappropriate and unethical conduct that flowed therefrom, notwithstanding its devastating impact on Majestic Insurance;

i. Knowingly and/or recklessly taking actions that concealed and perpetuated the Defendants' wrongful conduct and mismanagement of Majestic Insurance through increasingly aggressive and risky behavior that subjected Majestic Insurance to greater financial risk and harm over time;

j. Recklessly failing to recognize the adverse effects that the "fronting arrangement" with AmTrust would and did have upon Majestic Insurance's revenues and profitability, and focusing too closely upon preserving its customer base instead of making prudent decisions in light of its precarious financial position; and

k. Knowingly and recklessly continuing Majestic Insurance's business into 2010 and 2011 notwithstanding and in the face of the facts that came to light in the CDI Report, and notwithstanding and in the face of Majestic Insurance's significant financial losses, and knowingly and recklessly failing to take appropriate measures to mitigate the losses.

165. As a direct and proximate result of Hickey Sr.'s wrongful conduct and breaches of his fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**<u>COUNT XIV</u>**
**Aiding and Abetting Breach of Fiduciary Duty**
**(As to Hickey Sr.)**

166. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

167. As alleged herein, each of the other Defendants owed fiduciary duties of loyalty, due care, and good faith to Majestic Insurance and each breached such fiduciary duties.

168. Hickey Sr. knowingly induced the other Defendants to breach the fiduciary duties each of them owed to Majestic Insurance and/or participated with the other Defendants in

breaching their fiduciary duties by, amongst other things, engaging in the conduct described in Count XIII.

169. As a direct and proximate result of Hickey Sr.'s wrongful conduct, including his knowing inducement of and/or participation in the other Defendants' breaches of their respective fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT XV**
**Gross Negligence**
**(As to Hickey Sr.)**

170. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

171. Hickey Sr. owed Majestic Insurance a duty to act with due care in carrying out his responsibilities as a Director of Majestic Insurance, including but not limited to those responsibilities described in Counts XIII and XIV.

172. As described in Counts XIII and XIV, Hickey Sr. breached that standard of care by acting with gross negligence and with a reckless and/or knowing disregard for Majestic Insurance's financial well-being, taking actions that he knew, or absent his gross negligence and recklessness would and should have known, affirmatively and directly placed Majestic Insurance on the path to financial harm and eventual destruction.

173. As a direct and proximate cause of Hickey Sr.'s grossly negligent and reckless conduct, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT XVI**
**Breach of Fiduciary Duty**
**(As to Birsner)**

174. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

175. Birsner served as a Director of Majestic Insurance, and in that capacity had direct oversight responsibilities over the management and affairs of Majestic Insurance.

176. In his capacity as a Director of Majestic Insurance, Birsner owed Majestic

Insurance fiduciary duties that required him to carry out his management and oversight responsibilities with loyalty, with due care, and in good faith. Birsner intentionally and knowingly breached the fiduciary duties he owed to Majestic Insurance, recklessly disregarded those duties under circumstances in which he was or should have been aware of a risk of serious financial and reputational injury to Majestic Insurance, and acted in bad faith and contrary to Majestic Insurance's best interests, by engaging in the conduct set forth herein, including but not limited to:

a. Failing to implement (or to cause management to implement) a system of internal controls that was adequate in light of the business conducted by Majestic Insurance and the inherent risks that the nature of its business posed to Majestic Insurance;

b. Failing to implement (or to cause management to implement) adequate risk management and loss control practices that were designed to address the unique underwriting and operational risks that existed and that bore directly upon the ability of Majestic Insurance to operate profitably as a direct provider of workers' compensation insurance and to remain a viable going concern;

c. Creating and/or permitting others to create an operational protocol for Majestic Insurance that ignored sound and proven business practices and that focused on short-term revenue generation and that ignored the long-term consequences of such a course of conduct;

d. Repeatedly ignoring and/or recklessly failing to resolve promptly (or cause others to resolve promptly) the material weaknesses and/or significant deficiencies in internal controls that existed within Majestic Insurance that were called to his attention by multiple sources;

e. Blindly and unquestioningly following the direction and leadership of Hickey Jr. and acquiescing in the reckless management culture that he instilled and adopted, which emphasized short-term growth at any cost, meeting short-term financial targets, and management of earnings even though he knew and/or recklessly disregarded the fact that these same actions were destructive to Majestic Insurance's long-term financial health, exposed Majestic Insurance to massive losses, liabilities and untoward risks, and could, would and did ultimately destroy Majestic Insurance;

f. Knowingly and/or recklessly taking actions and/or permitting others to take actions that destroyed Majestic Insurance and exposed Majestic Insurance to huge losses, including but not limited to the following:

i. Permitting Hickey Jr. to assume day-to-day control of Majestic Insurance notwithstanding his lack of experience leading an insurance company, his known aggressive management style, and notwithstanding representations to the CDI that day-to-day control would remain with Majestic Insurance's existing management, including Sullivan and Stewart;

ii. Permitting Hickey Jr. and others to force Sullivan and Stewart out of Majestic Insurance, notwithstanding the known representations to the CDI that these individuals would remain as officers of Majestic Insurance and had executed employment agreements in furtherance of these representations, and recklessly disregarding the impact that their departures would have on Majestic Insurance;

iii. Knowingly and/or recklessly causing Majestic Insurance to enter into the Novation, thereby forcing Majestic Insurance to assume NYMAGIC's significant and increasing exposure to the GSITs based upon economic terms that were grossly unfair to Majestic Insurance, including an assumed loss ratio that Birsner knew or should have known was unreliable, inaccurate, and actually understated NYMAGIC's true exposure to the GSITs and the exposure that Majestic Insurance was otherwise assuming and which, therefore, resulted in Majestic Insurance taking on losses that exceeded the premiums of $9.2 million that NYMAGIC transferred to Majestic Insurance in consideration for the assumption of such losses;

iv. Knowingly and/or recklessly failing to make reasonable inquiry with respect to the Novation and whether the transaction was actually in Majestic Insurance's best interests, lacking good faith in participating in actions that caused Majestic Insurance to enter into the Novation, and causing Majestic Insurance to enter into the Novation in contravention of the duty of loyalty that he owed to Majestic Insurance;

v. Knowingly and/or recklessly failing to solicit the input of Stewart, Majestic Insurance's top financial officer, with respect to the Novation and whether the transaction was actually in Majestic Insurance's best interests, and excluding (or permitting others to exclude) Stewart from the May 2, 2007 meeting during which the Board voted to authorize the transaction;

vi. Disregarding the Whistleblower Letter and the numerous very serious issues and concerns raised therein—concerns that threatened Majestic Insurance's very existence, and that raised serious management integrity issues;

vii. Authorizing Hynes and Magnarella to lead a supposedly "independent" investigation of the Whistleblower Letter even though Birsner knew that Hynes and Magnarella had close personal relationships with Hickey Sr., Hickey Jr. and Scardino, which gave rise to a conflict of interest that would otherwise taint and bias the investigation;

viii. Knowingly or recklessly disregarding the fact that the Whistleblower Letter investigation would be and, in fact, was conducted in a manner that was designed to trivialize Stewart's concerns and to protect the interests of Hickey Jr. and the Defendants rather than to protect the interests of the Majestic Companies and, to the extent that Hynes and Magnarella relied heavily upon on representations made by Scardino—who was a friend of Hynes—Birsner knew or, absent his own recklessness would have known, that many of these representations had been contradicted by Stewart, who had no agenda other than to protect Majestic Insurance's financial well-being;

ix. Perpetuating and concealing the Defendants' wrongful conduct by failing to document properly (or to require the proper documentation of) the facts discovered in the course of the Whistleblower Letter investigation that Hynes and Magnarella performed;

x. Dismissing Stewart's concerns as mere "differences" in style and strategy, and refusing to probe into the substance of the "differences" that actually existed;

xi. Knowing and/or recklessly failing to acknowledge that the issues raised by Stewart were serious management integrity concerns that threatened Majestic Insurance's very existence, and turning a blind eye to those issues;

xii. Knowingly and/or recklessly permitting the Defendants to continue overriding Majestic Insurance's existing internal controls and its established underwriting guidelines and practices, notwithstanding Stewart's protestations that this conduct posed a grave financial threat to Majestic Insurance, and notwithstanding prior representations to the CDI that Majestic Insurance's business and underwriting standards would remain unchanged following the acquisition;

xiii. Knowingly and/or recklessly permitting the Defendants to use threats and/or coercion to force Majestic Insurance's underwriters to authorize business that did not otherwise comply with Majestic Insurance's existing underwriting guidelines;

xiv. Knowingly and/or recklessly permitting the Defendants to write high-risk business in New York, New Jersey, California and other states throughout 2007 and 2008, notwithstanding the fact that Stewart had warned that this business fell well outside Majestic Insurance's existing underwriting guidelines and placed Majestic Insurance at substantial financial risk;

xv. Knowingly and/or recklessly failing to implement or to cause the implementation of consistent and sound underwriting policies and procedures following Stewart's termination, notwithstanding the fact that Johnson Lambert disclosed the lack of such policies as a "significant deficiency" in internal controls;

xvi. Knowingly and/or recklessly permitting the Defendants to cause Majestic Insurance to insure former GSIT members even though he knew or should have known that the profiles of these members did not comport with Majestic Insurance's previous underwriting guidelines and even though he knew these members had poor loss histories, and failing to inquire about the effect that this unwarranted expansion of Majestic Insurance's business would have upon the company;

xvii. Knowingly engaging in conduct or permitting others, including Hickey Jr., to engage in conduct that was destructive to Majestic Insurance's business reputation, which was integral to its success as an insurer;

g. Knowingly and/or recklessly taking actions in a manner that protected Hickey Jr. and his improper management practices even when it was clear that those practices were not consistent with the best interests of Majestic Insurance;

h. Recklessly allowing his misguided loyalty to Hickey Jr. and Hickey Sr. to trump the primary duty of loyalty that Birsner owed to Majestic Insurance by, amongst other things, engaging in actions that were designed to facilitate, conceal, justify and/or downplay Hickey Jr.'s overly aggressive management style and the reckless, inappropriate and unethical conduct that flowed therefrom, notwithstanding its devastating impact on Majestic Insurance;

i. Knowingly and/or recklessly taking actions that concealed and perpetuated the Defendants' wrongful conduct and mismanagement of Majestic Insurance through increasingly aggressive and risky behavior that subjected Majestic Insurance to greater financial risk and harm over time;

j. Recklessly failing to recognize the adverse effects that the "fronting arrangement" with AmTrust would and did have upon Majestic Insurance's revenues and profitability, and focusing too closely upon preserving its customer base instead of making prudent decisions in light of its precarious financial position; and

k. Knowingly and recklessly continuing Majestic Insurance's business into 2010 and 2011 notwithstanding and in the face of the facts that came to light in the CDI Report, and notwithstanding and in the face of Majestic Insurance's significant financial losses, and knowingly and recklessly failing to take appropriate measures to mitigate the losses.

177. As a direct and proximate result of Birsner's wrongful conduct and breaches of his fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT XVII**
**Aiding and Abetting Breach of Fiduciary Duty**
**(As to Birsner)**

178. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

179. As alleged herein, each of the other Defendants owed fiduciary duties of loyalty, due care, and good faith to Majestic Insurance and each breached such fiduciary duties.

180. Birsner knowingly induced the other Defendants to breach the fiduciary duties each of them owed to Majestic Insurance and/or participated with the other Defendants in breaching their fiduciary duties by, among other things, engaging in the conduct described in Count XVI.

181. As a direct and proximate result of Birsner's wrongful conduct, including his knowing inducement of and/or participation in the other Defendants' breaches of their respective fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be

proven at trial but believed to be well in excess of $50,000,000.

**COUNT XVIII**
**Gross Negligence**
**(As to Birsner)**

182. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

183. Birsner owed Majestic Insurance a duty to act with due care in carrying out his responsibilities as a Director of Majestic Insurance, including but not limited to those responsibilities described in Counts XVI and XVII.

184. As described in Counts XVI and XVII, Birsner breached that standard of care by acting with gross negligence and with a reckless and/or knowing disregard for Majestic Insurance's financial well-being, taking actions that he knew, or absent his gross negligence and recklessness would and should have known, affirmatively and directly placed Majestic Insurance on the path to financial harm and eventual destruction.

185. As a direct and proximate cause of Birsner's grossly negligent and reckless conduct, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT XIX**
**Breach of Fiduciary Duty**
**(As to Hynes)**

186. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

187. Hynes served as a Director of Majestic Insurance, and in that capacity had direct oversight responsibilities over the management and affairs of Majestic Insurance.

188. In his capacity as a Director of Majestic Insurance, Hynes owed Majestic Insurance fiduciary duties that required him to carry out his management and oversight responsibilities with loyalty, with due care, and in good faith. Hynes intentionally and knowingly breached the fiduciary duties he owed to Majestic Insurance, recklessly disregarded those duties under circumstances in which he was or should have been aware of a risk of serious financial and reputational injury to Majestic Insurance, and acted in bad faith and contrary to

Majestic Insurance's best interests, by engaging in the conduct set forth herein, including but not limited to:

a. Failing to implement (or to cause management to implement) a system of internal controls that was adequate in light of the business conducted by Majestic Insurance and the inherent risks that the nature of its business posed to Majestic Insurance;

b. Failing to implement (or to cause management to implement) risk management and loss control practices that were designed to address the unique underwriting and operational risks that existed and that bore directly upon the ability of Majestic Insurance to operate profitably as a direct provider of workers' compensation insurance and to remain a viable going concern;

c. Creating and/or permitting others to create an operational protocol for Majestic Insurance that ignored sound and proven business practices and that focused on short-term revenue generation and that ignored the long-term consequences of such a course of conduct;

d. Repeatedly ignoring and/or failing to resolve promptly (or cause others to resolve promptly) the material weaknesses and/or significant deficiencies in internal controls that existed within Majestic Insurance that were called to his attention by multiple sources;

e. Blindly and unquestioningly following the direction and leadership of Hickey Jr. and acquiescing in the reckless management culture that he instilled and adopted, which emphasized short-term growth at any cost, meeting short-term financial targets, and management of earnings even though he knew and/or recklessly disregarded the fact that these same actions were destructive to Majestic Insurance's long-term financial health, exposed Majestic Insurance to massive losses, liabilities and untoward risks, and could, would and did ultimately destroy Majestic Insurance;

f. Knowingly and/or recklessly taking actions and/or permitting others to take actions that destroyed Majestic Insurance and exposed Majestic Insurance to huge losses, including but not limited to the following:

   i. Permitting Hickey Jr. to assume day-to-day control of Majestic Insurance notwithstanding his lack of experience leading an insurance company, his known aggressive management style, and notwithstanding representations to the CDI that day-to-day control would remain with Majestic Insurance's existing management, including Sullivan and Stewart;

   ii. Permitting Hickey Jr. and others to force Sullivan and Stewart out of Majestic Insurance, notwithstanding the known representations to the CDI that these individuals would remain as officers of Majestic Insurance and had executed employment agreements in furtherance of these representations, and recklessly disregarding the impact that their departures would have on Majestic Insurance;

   iii. Knowingly and/or recklessly failing to solicit the input of Stewart, Majestic Insurance's top financial officer, with respect to the Novation

and whether the transaction was actually in Majestic Insurance's best interests, and excluding (or permitting others to exclude) Stewart from the May 2, 2007 meeting during which the Board voted to authorize the transaction;

iv. Knowingly and/or recklessly causing Majestic Insurance to enter into the Novation, thereby forcing Majestic Insurance to assume NYMAGIC's significant and increasing exposure to the GSITs based upon economic terms that were grossly unfair to Majestic Insurance, including an assumed loss ratio that Hynes knew or should have known was unreliable, inaccurate, and actually understated NYMAGIC's true exposure to the GSITs and the exposure that Majestic Insurance was otherwise assuming and which, therefore, resulted in Majestic Insurance taking on losses that exceeded the premiums of $9.2 million that NYMAGIC transferred to Majestic Insurance in consideration for the assumption of such losses;

v. Knowingly and/or recklessly failing to make reasonable inquiry with respect to the Novation and whether the transaction was actually in Majestic Insurance's best interests, lacking good faith in participating in actions that caused Majestic Insurance to enter into the Novation, and causing Majestic Insurance to enter into the Novation in contravention of the duty of loyalty that he owed to Majestic Insurance;

vi. Disregarding the Whistleblower Letter and the numerous very serious issues and concerns raised therein—concerns that threatened Majestic Insurance's very existence and that raised serious management integrity issues;

vii. Leading an internal investigation of the Whistleblower Letter even though Hynes had close personal relationships with Scardino, Hickey Sr. and Hickey Jr., which gave rise to a conflict of interest that tainted and biased the investigation in a manner that trivialized the Whistleblower Letter and the very serious issues and concerns and management integrity issues raised therein;

viii. Knowingly and/or recklessly performing his investigation of the Whistleblower Letter in a manner that was designed to protect the interests of the Defendants rather than to protect the interests of the Majestic Companies, and in dismissing Stewart's concerns, Hynes relied largely upon the representations of Scardino—who was his friend—even though many of those representations had been contradicted by Stewart, who had no agenda other than to protect Majestic Insurance's financial well-being;

ix. Knowingly and/or recklessly disregarding clear evidence of unethical and/or inappropriate conduct during the course of the investigation of the Whistleblower Letter;

x. Perpetuating and concealing the Defendants' wrongful conduct by failing to document properly the facts discovered in the course of the investigation of the Whistleblower Letter, and dismissing Stewart's very serious issues and concerns in a vague and conclusory manner as mere "differences" in business strategy, without summarizing any of the interviews that he purportedly conducted;

xi. Dismissing Stewart's concerns as mere "differences" in style and strategy despite knowing otherwise, having met with Stewart;

xii. Knowing and/or recklessly failing to acknowledge that the issues raised by Stewart were serious management integrity concerns that threatened Majestic Insurance's very existence, and turning a blind eye to those issues;

xiii. Knowingly and/or recklessly permitting the Defendants to continue overriding Majestic Insurance's existing internal controls and its established underwriting guidelines and practices, notwithstanding Stewart's protestations that this conduct posed a grave financial threat to Majestic Insurance, and notwithstanding prior representations to the CDI that Majestic Insurance's business and underwriting standards would remain unchanged following the acquisition;

xiv. Knowingly and/or recklessly permitting the Defendants to use threats and/or coercion to force Majestic Insurance's underwriters to authorize business that did not otherwise comply with Majestic Insurance's existing underwriting guidelines;

xv. Knowingly and/or recklessly permitting the Defendants to write high-risk business in New York, New Jersey, California and other states throughout 2007 and 2008, notwithstanding the fact that Stewart had warned that this business fell well outside Majestic Insurance's existing underwriting guidelines and placed Majestic Insurance at substantial financial risk;

xvi. Knowingly and/or recklessly failing to implement or to cause the implementation of consistent and sound underwriting policies and procedures following Stewart's termination, notwithstanding the fact that Johnson Lambert disclosed the lack of such policies as a "significant deficiency" in internal controls;

xvii. Knowingly and/or recklessly permitting the Defendants to cause Majestic Insurance to insure former GSIT members even though he knew or should have known that the profiles of these members did not comport with Majestic Insurance's previous underwriting guidelines and even though he knew these members had poor loss histories, and failing to inquire about the effect that this unwarranted expansion of Majestic Insurance's business would have upon the company;

xviii. Knowingly engaging in conduct or permitting others, including Hickey Jr., to engage in conduct that was destructive to Majestic Insurance's business reputation, which was integral to its success as an insurer;

g. Knowingly and/or recklessly taking actions in a manner designed to further the interests of Hickey Jr. and his improper management practices, even when it was clear that those actions were not consistent with the best interests of Majestic Insurance;

h. Recklessly allowing his misguided loyalty to Hickey Jr. and Hickey Sr. to trump the primary duty of loyalty that Hynes owed to Majestic Insurance by, amongst other things, engaging in actions that were designed to facilitate, conceal, justify and/or downplay Hickey Jr.'s overly aggressive management style and the

reckless, inappropriate and unethical conduct that flowed therefrom, notwithstanding its devastating impact on Majestic Insurance;

i. Knowingly concealing and perpetuating the Defendants' wrongful conduct and mismanagement of Majestic Insurance through increasingly aggressive and risky behavior that subjected Majestic Insurance to greater financial risk and harm over time;

j. Recklessly failing to recognize the adverse effects that the "fronting arrangement" with AmTrust would and did have upon Majestic Insurance's revenues and profitability, and focusing too closely upon preserving its customer base instead of making prudent decisions in light of its precarious financial position; and

k. Knowingly and recklessly continuing Majestic Insurance's business into 2010 and 2011 notwithstanding and in the face of the facts that came to light in the CDI Report, and notwithstanding and in the face of Majestic Insurance's significant financial losses, and knowingly and recklessly failing to take appropriate measures to mitigate the losses.

189. As a direct and proximate result of Hynes's wrongful conduct and breaches of his fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT XX**
**Aiding and Abetting Breach of Fiduciary Duty**
**(As to Hynes)**

190. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

191. As alleged herein, each of the other Defendants owed fiduciary duties of loyalty, due care, and good faith to Majestic Insurance and each breached such fiduciary duties.

192. Hynes knowingly induced the other Defendants to breach the fiduciary duties each of them owed to Majestic Insurance and/or participated with the other Defendants in breaching their fiduciary duties by, amongst other things, engaging in the conduct described in Count XIX.

193. As a direct and proximate result of Hynes's wrongful conduct, including his knowing inducement of and/or participation in the other Defendants' breaches of their respective fiduciary duties, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000.

**COUNT XXI**
**Gross Negligence**
**(As to Hynes)**

194. The Liquidating Trustee hereby incorporates all of the preceding paragraphs by reference as though fully set forth herein.

195. In his capacity as a Director of Majestic Insurance, Hynes owed Majestic Insurance a duty to act with due care in carrying out his responsibilities, including but not limited to those responsibilities described in Counts XIX and XX.

196. As described in Counts XIX and XX, Hynes breached that standard of care by acting with gross negligence and with a reckless and/or knowing disregard for Majestic Insurance's financial well-being, taking actions that he knew, or absent his gross negligence and recklessness would and should have known, affirmatively and directly placed Majestic Insurance on the path to financial harm and eventual destruction.

197. As a direct and proximate cause of Hynes's grossly negligent and reckless conduct, Majestic Insurance sustained substantial financial damages in an amount to be proven at trial but believed to be well in excess of $50,000,000. Those damages include, but are not limited to, those damages incurred as a result of the matters alleged in Counts XIX and XX.

**V. PRAYERS FOR RELIEF.**

**WHEREFORE**, the Liquidating Trustee demands judgment in his favor and against the Defendants as follows:

a. on Count I, awarding to the Liquidating Trustee damages against Hickey Jr. in an amount to be determined at trial, together with pre-judgment interest thereon;

b. on Count II, awarding to the Liquidating Trustee damages against Hickey Jr. in an amount to be determined at trial, together with pre-judgment interest thereon;

c. on Count III, awarding to the Liquidating Trustee damages against Hickey Jr. in an amount to be determined at trial, together with pre-judgment interest thereon;

d. on Count IV, awarding to the Liquidating Trustee damages against Scardino in an amount to be determined at trial, together with pre-judgment interest thereon;

e. on Count V, awarding to the Liquidating Trustee damages against Scardino in an

amount to be determined at trial, together with pre-judgment interest thereon;

f. on Count VI, awarding to the Liquidating Trustee damages against Scardino in an amount to be determined at trial, together with pre-judgment interest thereon;

g. on Count VII, awarding to the Liquidating Trustee damages against Walczyk in an amount to be determined at trial, together with pre-judgment interest thereon;

h. on Count VIII, awarding to the Liquidating Trustee damages against Walczyk in an amount to be determined at trial, together with pre-judgment interest thereon;

i. on Count IX, awarding to the Liquidating Trustee damages against Walczyk in an amount to be determined at trial, together with pre-judgment interest thereon;

j. on Count X, awarding to the Liquidating Trustee damages against Taylor in an amount to be determined at trial, together with pre-judgment interest thereon;

k. on Count XI, awarding to the Liquidating Trustee damages against Taylor in an amount to be determined at trial, together with pre-judgment interest thereon;

l. on Count XII, awarding to the Liquidating Trustee damages against Taylor in an amount to be determined at trial, together with pre-judgment interest thereon;

m. on Count XIII, awarding to the Liquidating Trustee damages against Hickey Sr. in an amount to be determined at trial, together with pre-judgment interest thereon;

n. on Count XIV, awarding to the Liquidating Trustee damages against Hickey Sr. in an amount to be determined at trial, together with pre-judgment interest thereon;

o. on Count XV, awarding to the Liquidating Trustee damages against Hickey Sr. in an amount to be determined at trial, together with pre-judgment interest thereon;

p. on Count XVI, awarding to the Liquidating Trustee damages against Birsner in an amount to be determined at trial, together with pre-judgment interest thereon;

q. on Count XVII, awarding to the Liquidating Trustee damages against Birsner in an amount to be determined at trial, together with pre-judgment interest thereon;

r. on Count XVIII, awarding to the Liquidating Trustee damages against Birsner in an amount to be determined at trial, together with pre-judgment interest thereon;

s. on Count XIX, awarding to the Liquidating Trustee damages against Hynes in an

amount to be determined at trial, together with pre-judgment interest thereon;

t. on Count XX, awarding to the Liquidating Trustee damages against Hynes in an amount to be determined at trial, together with pre-judgment interest thereon;

u. on Count XXI, awarding to the Liquidating Trustee damages against Hynes in an amount to be determined at trial, together with pre-judgment interest thereon;

v. awarding to the Liquidating Trustee his reasonable attorneys' fees and costs; and

w. granting to the Liquidating Trustee such other and further relief as the Court deems just and proper.

## VI. DEMAND FOR JURY TRIAL.

The Liquidating Trustee hereby demands a trial by jury of all issues so triable to the fullest extent provided by law.

Dated: August 26, 2015

MICHELMAN & ROBINSON, LLP

/s/ Jeffrey D. Farrow

John Sebastinelli (State Bar No. 127859)
*Email:* jsebastinelli@mrllp.com
Jeffrey D. Farrow (State Bar No. 180019)
*Email:* jfarrow@mrllp.com
17901 Von Karman Avenue, Suite 1000
Irvine, CA 92614
Telephone: (714) 557-7990
Facsimile: (714) 557-7991

Nicholas DiCarlo
*Email:* ndicarlo@dcmplaw.com
(pro hac vice application pending)
Christopher A. Caserta (State Bar No. 194264)
*Email:* ccaserta@dcmplaw.com
DiCARLO CASERTA & McKEIGHAN PLC
6900 East Camelback Road, Suite 250
Scottsdale, Arizona 85251
Telephone: (480) 429-7544
Facsimile: (480) 429-7552

Steven C. Reingold
(pro hac vice application pending)
*Email:* sreingold@jagersmith.com
JAGER SMITH P.C.
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 951-0500
Facsimile: (617) 951-2414

Counsel to Plaintiff Lloyd T. Whitaker, in his capacity as the Liquidating Trustee of the Embarcadero Liquidating Trust